Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT C. WARDEN,<br>    Plaintiff,<br><br>    vs.<br><br>GREGORY J. NICKELS and<br>CITY OF SEATTLE,<br>    Defendants. | No: 2:09-cv-01686-MJP<br><br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION<br><br><br><br>NOTE ON MOTION CALENDAR:<br>Friday, January 8, 2010 |

INTRODUCTION

Plaintiff hereby moves for a preliminary injunction enjoining defendants from enforcing Executive Order 07-08 entitled "Gun Safety at City Facilities," Seattle Parks Department Rule/Policy Number P 060-8.14, and all other restrictions of any kind regarding firearm possession and/or any other aspect of firearms.  Plaintiff further requests that such preliminary injunction remain in effect until ultimate disposition of the above-captioned civil action.

Plaintiff's Motion for Preliminary Injunction

Page 1 of 16

Robert C. Warden
10224 SE 225th PL
Kent WA 98031
(206) 601-9541

1                              DISCUSSION

2         Plaintiff incorporates into this motion for preliminary
3  injunction all statements, facts, and claims made in the First
4  Amended Complaint, and all exhibits attached thereto.
5  LEGAL STANDARD
6         The Ninth Circuit recognizes two tests for demonstrating
7  preliminary injunctive relief: the traditional test or an
8  alternative sliding scale test. Cassim v. Bowen, 824 F.2d 791,
9  795 (9th Cir. 1987).  Under the traditional test, a party must
10 show: "1) a strong likelihood of success on the merits, 2) the
11 possibility of irreparable injury to plaintiff if preliminary
12 relief is not granted, 3) a balance of hardships favoring the
13 plaintiff, and 4) advancement of the public interest (in certain
14 cases)." Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1120
15 (9th Cir. 2005). Where a party demonstrates that a public
16 interest is involved, a "district court must also examine
17 whether the public interest favors the plaintiff." Fund for
18 Animals, Inc. v. Lujan, 962 F.2d 1391, 1400 (9th Cir. 1992).
19        Alternatively, a party seeking injunctive relief under
20 Fed. R. Civ. P. 65 must show either (1) a combination of
21 likelihood of success on the merits and the possibility of
22 irreparable harm, or (2) that serious questions going to the

Plaintiff's Motion for Preliminary Injunction                Robert C. Warden
                                                             10224 SE 225th PL
                                                             Kent WA 98031
(206) 601-9541

merits are raised and the balance of hardships tips sharply in favor of the moving party. Immigrant Assistance Project of the L.A. County of Fed'n of Labor v. INS, 306 F.3d 842, 873 (9th Cir. 2002); Sun Microsystems, Inc. v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999); Roe v. Anderson, 134 F.3d 1400, 1402 (9th Cir. 1998). "'These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases.'" Roe, 134 F.3d at 1402 (quoting United States v. Nutri-cology, Inc., 982 F.2d 394, 397 (9th Cir. 1992)); accord Sun Microsystems, 188 F.3d at 1119. "Thus, 'the greater the relative hardship to the moving party, the less probability of success must be shown.'" Sun Microsystems, 188 F.3d at 1119 (quoting Nat'l Ctr. for Immigrants Rights v. INS, 743 F.2d 1365, 1369 (9th Cir. 1984)).

IRREPARABLE INJURY

The Second Amendment to the Constitution of the United States reads, in relevant part, "[T]he right of the people to keep and bear arms, shall not be infringed." (In DC v. Heller, No. 07-290, June 26, 2008, the U. S. Supreme Court ruled that the Second Amendment guarantees an individual right, notwithstanding the beguiling prefatory clause referencing militia.)  Article I, section 24 of the Washington State

Constitution reads, in relevant part, "The right of the individual citizen to bear arms in defense of himself, or the state, shall not be impaired..."  Thus, both constitutions, in plain, direct, and unambiguous language, guarantee an individual right to carry (bear) firearms.

Defendants have promulgated a rule that intentionally and facially infringes and impairs the right to bear arms.  The rule was enforced against Plaintiff on November 14, and is still being enforced.  If Plaintiff went to the Southwest Community Center with his pistol tomorrow, there is no reason to suspect that the rule would not be enforced.  Defendants have and intend to continue to deny fundamental civil rights to individuals in violation of both federal and state constitutions.

That is the very essence of irreparable injury — harm that cannot subsequently be undone or compensated; injury for which damages cannot be compensable in money.  The constitutional civil right to bear arms is a matter of personal liberty, and does not lend itself to monetary damages.  Further, once a civil liberty has been denied in a discrete instance, with regard to that discrete instance, the right is gone forever.  Such injury is inherently irreparable.

LIKELIHOOD OF SUCCESS ON THE MERITS

Both federal and state constitutions guarantee an invidual right to bear arms.  Further, the right is specifically enumerated in both constitutions in separate, dedicated sections that deal only with the right.  In footnote number 27 of <u>DC v. Heller</u>, No. 07-290, June 26, 2008, page 56, the U. S. Supreme Court stated that rational basis review "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms."  The Heller Court thus includes the right to bear arms in the very select group of enumerated liberties considered fundamental to a free people, and to what it means to be an American.

The level of scrutiny applied to regulation of fundamental enumerated Constitutional rights is strict.  The Heller Court did not rule what the level of scrutiny should be for Second Amendment cases, but they did specifically rule out rational review, and they did characterize the right to bear arms as fundamental.  The Heller Court, on page 33, went so far as to favorably quote the following reference to the Second Amendment from Blackstone's Commentaries:  "This may be

considered as the true palladium of liberty .... The right to self-defence is the first law of nature."

On a side note, there is no question that Article I, section 24 of the Washington State Constitution applies to Defendants, who are state actors. The application of the Second Amendment of the U. S. Constitution to the states is a question that will be definitively answered by the U. S. Supreme Court this term in <u>McDonald v. City of Chicago</u>, Docket No. 08-1521. Given the ruling and reasoning of the majority in Heller, it is almost certain that the same majority will rule in McDonald to apply the Second Amendment to the states. Otherwise, they will have to coherently explain just how and why the 600 thousand residents of the District of Columbia enjoy the fundamental "true palladium of liberty" to which the remaining 300 million of us are not entitled.

<u>Strict Scrutiny</u>

The Seattle Parks Department gun ban at issue in this case could not possibly withstand strict scrutiny. First, Defendants have not articulated a compelling government interest to justify the ban. The purported interest, to protect children from gun violence, has no substance and no objective facts behind it. For example, how many children have been hurt or

threatened by firearms in Seattle Parks Department facilities in the last year, ten years, or ever?  The rate of actual or threatened gun violence against children in Seattle Parks Department facilities would have to be substantial to demonstrate a compelling government interest.  But Defendants have not cited even a single instance of actual or threatened violence in their justification contained within the written ban.  Defendants do nothing more than baselessly throw out the mere idea of child safety, and then leave it there to fend for itself without the slightest bit of objective fact or credible evidence behind it.

Defendants' gun ban is not narrowly tailored to achieve their interest.  If the goal is to protect the safety of children (or anyone, for that matter), then banning trained, law-abiding, concealed pistol licensed citizens does not advance that goal.  In fact, banning armed good guys likely makes a place less safe from bad guys (who will carry guns regardless of any signage out front), not more safe.

Defendants do cite in their written ban a study by University of Pennsylvania researchers that found that "people with a gun were 4.5 times more likely to be shot in an assault than those not possessing a gun."  However, their sample of

Plaintiff's Motion for Preliminary Injunction                Robert C. Warden
                                                             10224 SE 225th PL
                                                             Kent WA 98031
Page 7 of 16                                                 (206) 601-9541

1  persons shot by a gun while carrying a gun was composed mostly
2  of drug dealers, others with criminal records, cab drivers, and
3  women being stalked.  In other words, the sample was of
4  individuals who were already in danger of violence before they
5  strapped on their pistols.  Is anyone enlightened by the
6  stunningly obvious claim that armed drug dealers are more likely
7  to be shot by guns than your average person?
8        Below is a short article debunking the above study cut
9  and pasted in its entirely from reason.com/blog/2009/10/05/why-
10 skydivers-would-be-better/print.  It was written by Jacob
11 Sullum, senior editor of Reason Magazine, whose weekly column is
12 carried by newspapers across the U.S., including the *New York*
13 *Post*, *The Washington Times*, and the *Chicago Sun-Times*. His work
14 also has appeared in *The Wall Street Journal*, *USA Today*, *The New*
15 *York Times*, the *Los Angeles Times*, the *San Francisco Chronicle*,
16 *Cigar Aficionado*, *National Review*, and many other publications.
17 Plaintiff hereby adopts and incorporates into this Motion Mr.
18 Sullum's critcism of the Penn study:

19

**Why Skydivers Would Be Better Off Without Parachutes**

Jacob Sullum | October 5, 2009

In Philadelphia, researchers at the University of Pennsylvania find, possessing a gun is strongly associated with getting shot. Since "guns did not protect those who possessed them," they conclude, "people should rethink their possession of guns." This is like noting that possessing a parachute is strongly associated with being injured while jumping from a plane, then concluding that skydivers would be better off unencumbered by safety equipment designed to slow their descent. "Can this study possibly be as stupid as it sounds?" asks Stewart Baker at *Skating on Stilts*. Having shelled out $30 for the privilege of reading the entire article, which appears in the November *American Journal of Public Health*, I can confirm that the answer is yes.

The authors, led by epidemiologist Charles C. Branas, paired 677 randomly chosen gun assault cases with "population-based control participants" who were contacted by phone shortly after the attacks and matched for age group, gender, and race. They found that "people with a gun were 4.5 times more likely to be shot in an assault than those not possessing a gun." Branas et al. suggest several possible explanations for this association:

> A gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons. Along the same lines, individuals who are in possession of a gun may increase their risk of gun assault by entering dangerous environments that they would have normally avoided. Alternatively, an individual may bring a gun to an otherwise gun-free conflict only to have that gun wrested away and turned on them.

The one explanation the researchers don't mention is the one that will occur first to defenders of the right to armed self-defense: Maybe people who anticipate violent confrontations—such as drug dealers, frequently robbed bodega owners, and women with angry ex-boyfriends— are especially likely to possess guns, just as people who jump out of airplanes are especially likely to possess parachutes. The closest Branas et al. come to acknowledging that tendency is their admission, toward the end of the article, that they "did not account for the potential of reverse causation between gun possession and gun assault"—that is, the possibility that a high risk of being shot "causes" gun ownership, as opposed to the other way around. While the reseachers took into account a few confounding variables related to this tendency (including having an arrest record, living in a rough neighborhood, and having a high-risk occupation), they cannot possibly have considered all the factors that might make people more prone to violent attack and therefore more likely to have a gun as a defense against that hazard. To take just one example, not every criminal has an arrest record. Yet it seems fair to assume that criminals in Philadelphia are a) more likely than noncriminals to be armed and b) more likely than noncriminals to be shot. That does not mean having a gun increases their chance of being shot. Certainly they believe (as police officers do) that having a gun makes them safer than they otherwise would be. Nothing in this study contradicts that belief.

Finally, Defendants' gun ban is not the least restrictive means for achieving their purported interest. Just one obvious example of a less restrictive alternative to a blanket ban would be to include an exception for concealed pistol license holders. RCW 9.41.300 provides that "Cities, towns, counties, and other municipalities may enact laws and ordinances ... Restricting the possession of firearms in any stadium or convention center, operated by a city, town, county, or other municipality, except that such restrictions shall not apply to ... Any pistol in the possession of a person licensed [to carry a concealed pistol] under RCW 9.41.070" The state legislature, who has preempted the entire field of firearm regulation, therefore specifically protects the right of concealed pistol licensed citizens to carry firearms in local stadiums and convention centers.

For the reasons detailed above, Defendants' gun ban rule would not withstand any of the three required prongs of strict scrutiny.

<u>Intermediate Scrutiny</u>

The Seattle gun ban would fare no better under an intermediate level of scrutiny. As noted above, Defendants have not articulated a compelling government interest to justify the

ban.  Under intermediate scrutiny, the government interest must still be "important."  However, the purported interest, to protect children from gun violence, has no substance and no objective facts behind it.  For example, how many children have been hurt or threatened by firearms in Seattle Parks Department facilities in the last year, ten years, or ever?  The rate of gun violence against children in Seattle Parks Department facilities would have to be significant (at the very least quantified) to demonstrate an important government interest.  But Defendants have not cited a single instance of such violence in their justification contained within the written ban.  Again, Defendants do nothing more than baselessly throw out the mere idea of child safety, and then leave it there to fend for itself without the slightest bit of objective fact or credible evidence behind it.

    Next, the means to the important government interest would have to be substantially related to that interest.  As noted above, there is absolutely no credible evidence to suggest that Defendants' draconian gun ban positively relates to a safer envronment.  If the goal is to protect the safety of children (or anyone, for that matter), then banning trained, law-abiding, concealed pistol licensed citizens does not advance that goal.

1  In fact, banning armed good guys likely makes a place less safe
2  from bad guys (who will carry guns regardless of any signage out
3  front), not more safe.  Defendants' gun ban rule would thus not
4  withstand either prong of intermediate scrutiny.
5  <u>BALANCE OF HARDSHIPS</u>
7          Defendants have promulgated a rule that significantly
8  impacts a fundamental civil right without articulating any
9  objective rationale for doing so.  Defendants claim to want to
10 protect children without providing the slightest evidence to
11 suggest that any children were in any danger, or are in any less
12 danger with the rule in place.  To achieve this dubious
13 interest, Defendants have proclaimed that hundreds of Parks
14 Department properties are now "gun free zones," thus creating
15 target rich environments for violent criminals who choose to
16 ignore the gun ban.  Put bluntly, the gun ban is a fatally
17 flawed solution to a problem that simply does not exist.
18          So if this motion is granted, the hardship suffered by
19 Defendants will be the temporary inability to enforce an
20 irrational rule that arguably makes people less rather than more
21 safe from gun violence; a rule for which Defendants have failed
22 to objectively articulate any actual government interest that
23 would be advanced.  They would have to either remove or cover

their signs, and refrain from enforcing the rule.  That is all.

On the other hand, the hardship for Plaintiff (and for thousands of similarly-situated persons) if this motion is not granted is nothing less than the continued abrogation of a fundamental civil right in hundreds of areas that are generally open to the public.  Plaintiff and other law-abiding citizens who choose to exercise their right to bear arms will continue to be barred from these public areas because, and only because, they are unwilling to allow their enjoyment of the parks or recreation centers to be conditioned on forfeiting a fundamental constitutional liberty.

The balance of hardships tips completely in favor of Plaintiff.  The continued loss of the "true palladium of liberty" clearly outweighs Defendants interest in enforcing an irrational solution to an imagined problem.

ADVANCMENT OF PUBLIC INTEREST

See above discussion regarding the balance of hardships. There is no public interest advanced by intentionally denying a fundamental constitutional civil right, especially when that denial serves no demonstrated purpose.  However, the public interest clearly is served by insisting that state actors not infringe civil liberties in the absence of a compelling reason

to do so.

CONCLUSION

As detailed above, Plaintiff's motion for a preliminary injunction easily meets every prong of both the "traditional" and the "alternative sliding scale" tests.

FRCP 65(c) requires the posting of security by Plaintiffs "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Plaintiff requests the Court to set a nominal bond of one dollar in this case.  Simply, Defendants will not suffer any conceivable harm if the injunction is granted.

For the reasons detailed above, Plaintiff requests that the court grant this motion for a preliminary injunction enjoining defendants from enforcing Executive Order 07-08 entitled "Gun Safety at City Facilities," Seattle Parks Department Rule/Policy Number P 060-8.14, and any and all other restrictions of any kind regarding firearm possession and/or any other aspect of firearms.  Plaintiff further requests that such preliminary injunction remain in effect until ultimate disposition of the above-captioned civil action.

Plaintiff's Motion for Preliminary Injunction

Page 14 of 16

Robert C. Warden
10224 SE 225th PL
Kent WA 98031
(206) 601-9541

```
1       DATED this 13th day of December, 2009.
2
3                               Respectfully submitted,
4
5                               s/ Robert C. Warden
6                               Robert C. Warden, WSBA No. 21189
7                               10224 SE 225th PL
8                               Kent WA 98031
9                               (206) 601-9541
```

| | |
|---|---|
| 1 | <u>CERTIFICATE OF SERVICE</u> |
| 2 | I hereby certify that on December 13, 2009, I |
| 3 | electronically filed the following documents with the Clerk of |
| 4 | the Court using the CM/ECF system which will send notification |
| 5 | of the filing to all counsel of record: |
| 6 | PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION |
| 7 | PRELIMINARY INJUNCTION DRAFT ORDER |
| 8 | DATED this 13th day of December, 2009. |
| 9 | <u>s/ Robert C. Warden</u> |
| 10 | Robert C. Warden, WSBA No. 21189 |
| 11 | 10224 SE 225th PL |
| 12 | Kent WA 98031 |
| 13 | (206) 601-9541 |