1

**Daniel J. Dunne, Jr.**
2    WSBA No. 16999
ddunne@orrick.com
3    **George E. Greer**
WSBA No. 11050
4    ggreer@orrick.com
**David S. Keenan**
5    WSBA No. 41359
dkeenan@orrick.com
6    **ORRICK HERRINGTON & SUTCLIFFE LLP**
7    701 Fifth Avenue Suite 5700
Seattle, WA 98104-7097
8    Telephone: (206)839-4300
Facsimile:  (206)839-4301
9

10   **Gary Keese**
WSBA No. 19265
11   gary.keese@seattle.gov
**SEATTLE CITY ATTORNEY**
12   600 Fourth Avenue, 4th Floor
P.O. Box 94769
13   Seattle, WA  98124-4769
Telephone: (206)684-8200
14   Facsimile:  (206)684-8284

15

16   *Attorneys for Gregory J. Nickels and City of Seattle*

17                    UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
18                              AT SEATTLE

19
ROBERT C. WARDEN,
20
Plaintiff,                    Case No. 2:09-CV-01686-MJP
21
v.
22
GREGORY J.  NICKELS and CITY OF          DECLARATION OF DAVID S.
23   SEATTLE                                 KEENAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO
24                                            PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
25

26

27

28

DECLARATION OF DAVID S. KEENAN                    Orrick Herrington & Sutcliffe LLP
CASE NO. 2:09-CV-01686-MJP                              701 5th Avenue, Suite 5700
Seattle, Washington  98104-7097
tel+1-206-839-4300

1

I, David S. Keenan, declare as follows:

1.      I am an attorney licensed in the State of Washington.  I am associated with the law firm of Orrick, Herrington & Sutcliffe LLP ("Orrick"), counsel of record for defendants Gregory J. Nickels and City of Seattle (collectively, "Defendants") in the above-captioned matter.  I submit this declaration in support of Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction.  I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto.

2.      On December 22, 2009, I was present for and participated in the deposition of Plaintiff Robert C. Warden.  A true and correct copy of the transcript of Mr. Warden's deposition is attached hereto as Exhibit A.

3.      On January 19, 2010, I assembled various media accounts of Plaintiff's visit to the Southwest Community Center on November 14, 2009. True and correct copies of a sampling of this media coverage are attached hereto as Exhibit B.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of January, 2010, in Seattle, Washington.

_____
s/David S. Keenan
David S. Keenan

DECLARATION OF DAVID S. KEENAN
CASE NO. 2:09-CV-01686-MJP

2

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that on January 19, 2010, I electronically filed the following

document with the Clerk of the Court using the CM/ECF system which will send notification

4

of the filing to all counsel of record:  DECLARATION OF DAVID S. KEENAN IN

5

SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR

6

PRELIMINARY INJUNCTION.

7        DATED this 19th day of January, 2010.

8

9                              ORRICK, HERRINGTON & SUTCLIFFE LLP

10

11                        By  s/ Daniel J. Dunne
                              Daniel J. Dunne (WSBA #16999)
12
                              701 Fifth Avenue, Suite 5700
13                            Seattle, WA  98104
                              Phone: (206) 839-4300
14                            Fax:    (206) 839-4301
                              Email: ddunne@orrick.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

# EXHIBIT A

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | | |
|---|---|---|
| ROBERT C. WARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | No. C09-1686 MJP |
| | ) | |
| v. | ) | |
| | ) | |
| GREGORY J. NICKELS and CITY OF SEATTLE, | ) | |
| | ) | |
| Defendants. | ) | |

_____

DEPOSITION UPON ORAL EXAMINATION OF

ROBERT C. WARDEN

_____

Tuesday, December 22, 2009

10:03 a.m.

Orrick Herrington & Sutcliffe LLP

701 5th Avenue, Suite 5700

Seattle, Washington

Laurie E. Heckel, CSR, RPR
Court Reporter

Page 2

1           Tuesday, December 22, 2009
            Seattle, Washington
2
            A P P E A R A N C E S
3
   For the Plaintiff:      ROBERT C. WARDEN
4                      Pro Se
                       10224 SE 225th Place
5                      Kent, Washington  98031
6   For the Defendants:    DANIEL J. DUNNE
                       DAVID S. KEENAN
7                      GEORGE E. GREER
                       Attorneys at Law
8                      Orrick Herrington & Sutcliffe LLP
                       701 5th Avenue, Suite 5700
9                      Seattle, Washington  98104-7097
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1           Tuesday, December 22, 2009
            Seattle, Washington
2
3           I N D E X
4   Witness: ROBERT C. WARDEN                Page
5       Examination by Mr. Dunne              4
6
            E X H I B I T S
7
   No.  Description                 Marked/ID'd
8
   1    E-mail dewey.potter@seattle.gov from    26
9        bob@warden.biz, 11/13/09
10   2    The Critical Thinker               66
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                ROBERT C. WARDEN
2      having been called as a witness, was duly sworn and testified
3      as follows:
4           E X A M I N A T I O N
5   BY MR. DUNNE:
6   Q   What's your name?
7   A   My name is Robert Warden.
8   Q   And is it okay if I call you by, Bob?
9   A   Bob is good, yes, exactly.
10   Q   Okay.  Bob, where do you live?
11   A   In Kent.
12   Q   And what's your address?
13   A   10224 Southeast 225th Place.
14   Q   And how long have you lived there?
15   A   Just since March of this year.
16   Q   Before March, where did you live?
17   A   Before March, I lived briefly at my parents' condo while I
18      was waiting for my home in Vancouver, Washington to sell.
19   Q   Okay.  And so did you live in -- how long did you live in
20      Vancouver before living with your parents?
21   A   Oh, nine -- eight and a half years.
22   Q   Okay.  And before Vancouver, Washington, where did you live?
23   A   Falls Church, Virginia for three years.
24   Q   That takes us back to -- what year did you move to Falls
25      Church?

Page 5

1   A   1997.
2   Q   1997.  Okay.  So were you in Vancouver from 2000 to --
3   A   Yes, 2000 to 2008, August of '08, I believe.
4   Q   Okay.  That gets us back about ten years.
5   A   I was in Seattle the entire time before that, so it makes it
6      easy.
7   Q   So did you grow up in Seattle?
8   A   Yeah.
9   Q   Whereabouts in Seattle?
10   A   In West Seattle, Highland Park area.
11   Q   Where did you go to high school?
12   A   Rainier Beach, part of the bussing program.
13   Q   Okay.  That segues right into where did you go to college?
14   A   University of Washington.
15   Q   What year did you graduate?
16   A   '87.
17   Q   And what was your degree in?
18   A   Double major in English and philosophy.
19   Q   What did you do after you graduated?
20   A   I took a year off and worked a little bit for the postal
21      service as a temporary letter carrier, and then went to law
22      school also at the UW.
23   Q   Okay.  When did you graduate from the Washington Law School?
24   A   '91.
25   Q   And then what did you do?

2  (Pages  2  to  5)

Page 6

1    A  Well, let me see, I worked -- I worked part-time for Mary
2       Ruth Mann, a plaintiff's employment law attorney, from the
3       time I graduated until summer of '92. About that time, I
4       had -- I had a wife and two children, and was only working
5       part-time in a bad economy, so I went to work for the postal
6       service again.
7    Q  What was your position with the postal service?
8    A  I started carrying -- I was carrying mail from '92 through
9       '95. From '95 to '96, I was a supervisor, and from '96 to
10      '97, I was a labor relations specialist.
11   Q  Is that a position that requires a law degree, or is that
12      a --
13   A  No.
14   Q  Okay.
15   A  It comes in handy, but not required.
16   Q  Okay. And where were you as a labor relations specialist?
17   A  This was all -- this was all in Seattle.
18   Q  Okay. And then what happened in 1997?
19   A  Got a promotion to a position of, what the heck was it,
20      government relations representative at postal headquarters in
21      Washington, D.C.
22   Q  And you were there until 2000?
23   A  Yes, three years there.
24   Q  Okay. And you came back to Vancouver, Washington?
25   A  Yeah. I got the job in Portland right across the river as

Page 7

1       manager labor relations, still for the postal service, and I
2       was in that position from 2000 to 2008.
3    Q  All -- so for a manager in labor relations, is that in a
4       particular office or a region?
5    A  Yeah, it was the Portland District, which encompassed the
6       whole State of Oregon and a portion of Southwest Washington.
7       And while on paper I was in that position from 2000 to 2008,
8       in the middle of that from 2002 to 2005, I served full-time
9       in a -- what they call a detail as a litigation attorney in
10      employment law, still domiciled there, but working for an
11      office somewhere else.
12   Q  Okay. Have you had your deposition taken before?
13   A  Yes.
14   Q  Okay. So are you generally comfortable and familiar with the
15      process?
16   A  Yeah, I'd say so.
17   Q  And you understand that you're under oath, of course. Is
18      that right?
19   A  Yes.
20   Q  Okay. If I ask you any questions that aren't clear to you or
21      that you don't understand, will you please tell me that?
22   A  Yes.
23   Q  Because if you don't tell me that, then I will assume that
24      you understand my question, and anyone reading the transcript
25      will assume that the question was clear. Is that -- is that

Page 8

1       okay?
2    A  Yeah.
3    Q  Okay. And, Mr. Warden, you're here representing yourself,
4       correct?
5    A  Right.
6    Q  All right. But except for a short stint, you actually
7       haven't practiced litigation, at least for most of your
8       career; is that correct?
9    A  That's right.
10   Q  In your labor positions, with the exception of your detail in
11      litigation, did you go into Federal Court?
12   A  Ah, yes, kind of as a second chair type of --
13   Q  Okay.
14   A  -- situation.
15   Q  So you -- you have at least some familiarity with --
16   A  Right. I've been a -- and I've been a witness in Federal
17      Court, at least twice that I can remember.
18   Q  Okay. And when you said, a second chair, were you a second
19      chair in -- in federal labor related litigation?
20   A  Yes.
21   Q  Okay.
22   A  Employment discrimination.
23   Q  In working for the postal service, did you witness or were
24      you affected by any incidents where people were shot by other
25      postal workers?

Page 9

1    A  I did not witness any. I -- I was peripherally involved, I
2       guess, in -- there was one in -- that happened in Baker City,
3       Oregon in April of 2006, which was within the Portland
4       District, and I was, you know, acting in the position -- I
5       was in the position of manager labor relations at the time,
6       so, you know, I was involved in kind of the, I don't know
7       what you call it, the background of looking at the facts, and
8       was there someway that somebody should have seen something
9       coming, you know, all the kind of questions that one asks
10      after an event like that.
11   Q  And can you describe what the circumstances of that shooting
12      were?
13   A  Yeah, Grant Gallaher (ph), I think was the guy's name, he was
14      a letter carrier. He was the shooter. He had been contacted
15      on the street, I guess by cell phone, by his supervisor
16      who -- who had informed him that he needed to carry overtime
17      that day. He was dissatisfied with that news, and on his way
18      back to the post office in the afternoon he stopped at his
19      home, picked up a revolver, and when he got back to the post
20      office, he -- actually, his supervisor was in the parking
21      lot, so he ran over her. Then he parked and went into the
22      post office and looked for the post master, who he could not
23      find. Then he came back out and shot the supervisor several
24      times.
25   Q  And this was the supervisor who had called to order him to --

7

Page 10

1   A  Yes, she was the only supervisor in the facility.

2   Q  -- to work overtime.

3   A  Yeah.

4   Q  I should also say if you -- if you would, please, before you

5      give me your answer, even if you know where I'm going, make

6      sure you let me finish my question, because otherwise we'll

7      put a little bit of a strain on our court reporter.

8   A  Understood.

9   Q  And you investigated the circumstances of the shooting?

10   A  Yeah. I mean, I wasn't the only one, you know, probably

11      every -- every district level manager was -- was involved in,

12      you know, what are we saying to the press, what are we saying

13      to the unions, what are we saying to, you know, and I was

14      primarily as the manager of labor relations was kind of

15      coordinating communication with the unions.

16   Q  And did you also look to see where there were warning signs

17      that the person might commit a crime?

18   A  I didn't personally. We -- there's a position; there is

19      someone responsible for that kind of, you know, workplace

20      environment situation, and I guess they did. But I drafted

21      the letter of resignation that the guy signed in prison, but

22      that was my most direct involvement.

23   Q  Okay. And to your knowledge, was -- what was the -- what was

24      the gentleman's last name?

25   A  Gallaher (ph).

Page 11

1   Q  Gallaher (ph). Okay.

2   A  I'm not sure of the spelling, but --

3   Q  And did he have a criminal record or a criminal background

4      before he shot his supervisor?

5   A  I don't know. Not that I know of, but I don't know.

6   Q  Okay. And any indication that he was not lawfully in

7      possession of a weapon at the time he shot his supervisor?

8   A  I also don't have any knowledge of that.

9   Q  Okay. So as far as you know, he was perfectly licensed and

10      permitted to -- to own a firearm at his home?

11   A  I -- I don't either way, but I don't know otherwise.

12   Q  Okay. I've read -- and we'll get to a couple of things

13      you've written where you've mentioned good guys and bad

14      guys. Was there any indication he was a bad guy who should

15      be prohibited from having a weapon before he shot his

16      supervisor?

17   A  From what I remember, and, again, it's kind of secondhand,

18      but from what I remember there were no indications that he

19      would do something like he did.

20   Q  What firearms do you own personally?

21   A  I personally own a 22-caliber pistol, target pistol, and a

22      40-caliber Glock Model 27.

23   Q  And have you taken training classes in the use and storage of

24      firearms?

25   A  Yes.

Page 12

1   Q  Can you describe what classes you've taken, please.

2   A  I took the -- what I think the NRA calls the basic pistol

3      course, which is a ten-hour classroom style course. And then

4      about a year after that, I think it was, I took a course to

5      become certified to teach the first course, and that course

6      was about a 20-hour course, as I recall.

7   Q  Do you have any military background?

8   A  I do not. Oh, I have one other thing. I also, subsequent to

9      that second training, took a -- sort of a correspondence

10      deal. Once you take that second training and pass it and

11      teach the class a couple of times, you're eligible to then

12      take just via home study class and become a range safety

13      officer, and I also took that, and am a certified one of

14      those.

15   Q  What are the elements of the basic pistol safety course?

16   A  Well, it covers -- I mean, it covers the basic parts and

17      functioning of the revolver and a semi-automatic pistol, you

18      know, the two kinds of pistols. You know, emphasis on safe

19      handling of that and safe storage of that. Throughout the

20      entire course, that's, of course, the primary -- primary

21      focus, and then teaches the proper positioning and -- and

22      handling while -- to shoot, you know, aim and shoot at

23      targets.

24   Q  About how much of the course is devoted to safe handling and

25      safe storage?

Page 13

1   A  I'd say a good -- let's see, it's a ten-hour course. I'd say

2      there are two hours that are devoted exclusively to that, and

3      then all the other elements of the course have it mixed in

4      probably close to 50 percent of the rest of it.

5   Q  How long have you been certified to teach that course?

6   A  Certified to teach it since January of '07.

7   Q  And have you been teaching that course actually?

8   A  I've taught the course at least three times, maybe four

9      times, three or four times.

10   Q  So I take it that you're relatively familiar with the basics

11      of safe handling and safe storage?

12   A  Yes.

13   Q  Okay. And, again, this is a course offered by the National

14      Rifle Association?

15   A  Yes. They're the ones who put the course materials together

16      and you -- yeah.

17   Q  Do you know whether this is the course that if a person were

18      to take a basic pistol course is the most popular or the most

19      likely course they would take in Washington?

20   A  I don't know for sure. I know in order to get a concealed

21      pistol permit in Oregon, you have to take a basic course, but

22      that course is much shorter. I think it's, like, four hours

23      or even less maybe.

24   Q  Uh-huh.

25   A  I just know this is considered the basic pistol course.

Page 14

1  Q  And to your knowledge, there is no actual requirement that
2     anyone take a basic pistol course or safety course to own a
3     handgun in Washington, is there?
4  A  You are correct.  There is not that requirement.
5  Q  So I could go, assuming I passed the background check, buy
6     myself a pistol, and there would be absolutely no legal
7     requirement that I would have taken any safety courses or
8     studied in any way the safe handling and storage of a gun.
9  A  I believe that's true.
10 Q  And -- okay.  You mentioned the basic pistol course, that
11    you're certified to teach the course, and that you're a range
12    safety officer.  Does that completely cover the training that
13    you have taken?
14 A  I believe it does.
15 Q  Okay.  Do you have any information about what percentage of
16    gun owners in Washington have actually taken the basic pistol
17    training course?
18 A  No, I have no idea.
19 Q  And there is no way to determine whether any particular gun
20    owner, who is either storing a gun in their home or carrying
21    a concealed pistol has taken it, is there?
22 A  I -- not that I know of.  You know, maybe some complex search
23    at NRA training headquarters, but, yeah, I don't know.
24 Q  And I believe from your complaint that you also had a
25    concealed pistol license, right?

Page 15

1  A  Right.
2  Q  What is that?
3  A  That is a license issued -- required by the state in order to
4     carry a concealed pistol license.  I think it's issued
5     actually by -- at the county level or something.
6  Q  In order to get a concealed pistol license, did you have to
7     demonstrate that you had taken any safety or safe storage
8     courses?
9  A  No.
10 Q  Are you aware of any requirement that people do take safety
11    courses in order to get a concealed pistol license?
12 A  I believe there is not -- I believe that there is not a
13    requirement.
14 Q  Are you aware that assuming that you meet the background test
15    and you don't have particular kinds of felony convictions or
16    mental illness that a person can get a concealed pistol
17    license without proof of any course in the safe operation and
18    storage of a handgun?
19 A  That's right.  The statute does not require any such
20    training.
21 Q  But you do have to be 21 years of age, right?
22 A  Yes.
23 Q  Okay.
24 A  You have to be 21 to carry a pistol in the State of
25    Washington anywhere.

Page 16

1  Q  And is a person who has a concealed pistol license required
2     to take any training or courses in under what circumstances
3     deadly force might be permitted?
4  A  No.
5  Q  Have you ever taken any training other than legal training in
6     law school as to under what circumstances deadly force might
7     be appropriate?
8  A  No.
9  Q  And if you pull out a pistol and shoot at somebody, you may
10    be using deadly force, correct?
11 A  Yeah.
12 Q  Do you know how many concealed pistol licenses there are in
13    Seattle?
14 A  No.
15 Q  In Washington?
16 A  No.
17 Q  How long have you had a concealed pistol license?
18 A  My -- the current one I have had since early 2007, about the
19    time I became a certified instructor.  Prior to that, I had
20    one in the early 90's, which I think expired when I lived in
21    Virginia or something, yeah.
22 Q  Okay.  Do you know even whether the majority of people who
23    have concealed pistol licenses have taken any safety training
24    course?
25 A  I have no idea.

Page 17

1  Q  Is there any way for anyone to know that information to the
2     best of your knowledge?
3  A  You could probably do some really complex time-consuming
4     research at the NRA office that has those records, but -- but
5     not that I know of.
6  Q  Have you in some way or other provided information to the NRA
7     so that that organization is aware that you possess a
8     concealed pistol license?
9  A  No.
10 Q  Are you aware of any information collection process that they
11    have to obtain that information?
12 A  No.
13 Q  Since you've gotten your concealed pistol license, when you
14    travel around King County and the city, do you typically
15    carry a concealed weapon?
16 A  No.
17 Q  How often do you actually carry it?
18 A  Maybe a couple of times a month, if that.
19 Q  And for what purpose?
20 A  Basically, just -- just to be on the safe side I guess.  I
21    mean, just self-defense.
22 Q  Uh-huh, are there particular locals that you might travel to
23    where you feel that it's better to have a concealed weapon?
24 A  I guess on the occasions that I do take it, it's generally if
25    I'm going somewhere with my family at night in a -- you know,

Page 18

1    in the city or a highly populated area.
2  Q   Uh-huh.
3  A   Yeah.
4  Q   Okay. Since you had returned from -- well, let me ask you
5     this: Have you ever gone places where you weren't able to
6     take your gun and you had to store it?
7  A   No.
8  Q   Okay. Have you ever had occasion where you knew you couldn't
9     go into a locale or a stadium or a venue with your gun and
10    you were required to lock it in your car?
11  A   No.
12  Q   You've never had a gun stolen from you, have you?
13  A   No.
14  Q   And have you ever had to use your gun for self-defense?
15  A   No.
16  Q   Have you ever had to use it to stop a crime in progress?
17  A   No.
18  Q   If you saw a crime in progress and you had your weapon on you
19    in public, would you use it to stop a crime in progress?
20  A   Well, that's -- that would be pure speculation. I guess I'd
21    like to think I would do what was -- was useful and helpful,
22    but I couldn't say what anybody would do under those
23    circumstances had there been, hoping never to be there.
24  Q   Right. We all do. How about if you saw a purse snatcher who
25    snatched a purse right front of you?

Page 19

1  A   Same answer, speculative, and I -- I don't know.
2        (Mr. Greer entered the room.)
3        MR. DUNNE:  My partner, George Greer, has just entered.
4        THE WITNESS:  Nice to meet you.
5        MR. GREER:  Thank you.
6        MR. DUNNE:  And you did meet Mr. Keenen here.
7        THE WITNESS:  Yes.
8        MR. DUNNE:  Okay.
9        THE WITNESS:  From the City?
10       MR. DUNNE:  No, he's -- we're all from the firm here.
11       THE WITNESS:  You're all -- okay, yeah.
12       MR. DUNNE:  I'm sorry for the interruption.
13       So you've been back in Washington since 2000?
14       THE WITNESS:  Yes.
15  Q   (By Mr. Dunne)  For most of that time, you were in the City of
16    Vancouver, right?
17  A   Yes.
18  Q   Could you refresh my recollection? When did you get back up
19    into King County?
20  A   August of '08.
21  Q   Of '08. Here we are, December of '09. So in that 15-month
22    period or so, how many times have you had occasion to visit
23    City of Seattle parks and park facilities?
24  A   This is a total estimate, but probably 15 to 20.
25  Q   And can you tell me which places you've visited?

Page 20

1  A   Yeah, I've been to Alki, Alki Beach quite a few times,
2     because there is restaurants down there that we like. That
3     would be the majority of probably my visits, Lincoln Park in
4     West Seattle, two, three, four times. Yeah, I can't -- I'm
5     sure there are others, but not, you know, super frequently.
6  Q   Any particular venues that you can remember other than Alki
7     Beach or Lincoln Park, recognizing that you can't remember
8     exactly the number of times?
9  A   I don't know if the field by Rainier Beach High School is a
10    city park or not. I've been there. West Crest Park in South
11    Seattle, I think that's a city park. Yeah, again, this is
12    just kind of from where -- from where I generally would go
13    based on, you know, conducting business or whatever, Schmitz
14    Park, I've probably been into Schmitz Park in West Seattle.
15  Q   Any others?
16  A   Not that come to mind right now.
17  Q   Now, when you have visited those parks in the past, have you
18    carried a concealed weapon?
19  A   I believe only at Lincoln Park, once.
20  Q   So when did you visit Lincoln Park?
21  A   It was on Wednesday, November 11th of this year, the time
22    that I carried the pistol.
23  Q   And if you've visited parks an estimate of 15 to 20 times in
24    the last 15 months, why did you carry a pistol just for that
25    occasion in Lincoln Park?

Page 21

1  A   Because I was looking for the sign telling me I couldn't.
2     That was two days before, or three days before I went into
3     the South Seattle Community Center, and I was trying to find
4     a good locale. I couldn't find the sign, by the way.
5  Q   Okay. So you were in Lincoln Park and the City had passed
6     its policy prohibiting carrying guns in certain facilities,
7     correct?
8  A   Yes.
9  Q   And up until that point in time, to the best of your
10    recollection, although you had visited parks and facilities
11    owned by the City, you had never carried your concealed
12    weapon, correct?
13  A   That's correct, not that I recall.
14  Q   Okay. And I take it from your complaint that you felt that
15    the City had acted unlawfully in passing its policy, correct?
16  A   Yeah. I don't know if, "passing" is the right word, but --
17  Q   Enacting.
18  A   Yes, promulgating, proclaiming, yeah.
19  Q   And so when you went to Lincoln Park, you went there for the
20    purpose of setting up your lawsuit, right?
21  A   Ah, yes, uh-huh.
22  Q   Okay. And you did not find signs prohibiting you from
23    carrying a gun in the park at that time?
24  A   That's correct. Actually, there had been a photo in the West
25    Seattle blog of the sign by the children's play area, and

Page 22

1   when I went there on the 11th, it was not in that same area,
2   so I did not find the sign.
3   Q   Okay. Did you understand -- where in Lincoln Park did you
4   actually go?
5   A   The children's area, which is on the I guess south -- south
6   end of it toward the ferry dock.
7   Q   Uh-huh.
8   A   And then drop down the hill to the beach front, looking to
9   see maybe the sign was there, pretty much just around that
10   south end.
11   Q   And Lincoln Park is a very large park, correct?
12   A   It is, yes.
13   Q   And how much time did you spend looking for signs in Lincoln
14   Park?
15   A   Ten minutes, 15 minutes.
16   Q   And in that time you found no area that was prohibited to
17   you?
18   A   Right. And I was specifically looking in the one area where
19   I thought based on the photo the sign would be, but I did not
20   see it.
21   Q   So, in other words, in the time you were in Lincoln Park, the
22   entire park that you traveled through was accessible and open
23   to you as a concealed weapons carrier, correct?
24   A   Well, I think so. There was one older sign right at the very
25   south walking entrance that leads down to the beach that had

Page 23

1   a list of several things that were prohibited, and among them
2   I think it said, "Weapons," but, again, that was an older
3   sign. It had nothing to do with this rule.
4   Q   Okay. So that was on November 11th. What did you do with
5   respect to the city policy after going to Lincoln Park and
6   not being able to find a sign?
7   A   Let's see, I drove past the Southwest Community Center and
8   noticed they did have a sign.
9   Q   Had you visited the Southwest Community Center at a time
10   prior to November of 2009?
11   A   Not since 1997, when my children had swim lessons there.
12   Q   And you were living in Federal Way at that time; is that
13   right?
14   A   No, living in West Seattle.
15   Q   Oh, West Seattle. And when you would go to the Southwest
16   Community Center in the 90's for children lessons, for swim
17   lessons, the children swim lessons, did you carry a concealed
18   weapon at that time?
19   A   No. Not -- you mean, to that specific location during the
20   swim lessons?
21   Q   Right.
22   A   No.
23   Q   And so the purpose of driving past the Southwest Community
24   Center in November of 2009 was you were looking for a place
25   where there was a sign prohibiting gun carrying and

Page 24

1   possession, correct?
2   A   Yes.
3   Q   Again, for the purpose of challenging that -- that policy?
4   A   Yes.
5   Q   And you had no other recreational purpose to do so at that
6   time, correct?
7   A   No.
8   Q   All right. Did you find the sign when you drove past the
9   Southwest Community Center?
10   A   Yes.
11   Q   And was that the same day, November 11th, that you went to
12   Lincoln Park?
13   A   Yes.
14   Q   All right. And then what did you do after you found that
15   sign?
16   A   Made our way home. I can't remember if we stopped anywhere
17   else, but I think we just went home.
18   Q   Oh, so your children were with you?
19   A   Oh, I'm sorry. I was with my -- my -- one of my sons.
20   Q   Okay. Which one?
21   A   His nickname is Casey. He's 18 years old.
22   Q   I should have asked you. Are you currently married?
23   A   Yes.
24   Q   And how many children?
25   A   Two.

Page 25

1   Q   Casey and --
2   A   Kenny, Carson and Kenny. Kenny is 19.
3   Q   Now, up until November 11th, had you had communications with
4   other people about the -- for lack of a better word, the
5   Seattle policy?
6   A   I'm not really sure. I'm -- I'm sure I spoke to -- you know,
7   after reading about it in the paper, I probably spoke to my
8   kids, my wife, you know, my family just about it.
9   Q   I -- you know, you might have spoken to neighbors, coworkers,
10   or something that -- I don't mean to in any way to be
11   secretive. I just --
12   A   Yeah.
13   Q   Did you speak to anyone at the Second Amendment Foundation --
14   A   No.
15   Q   -- as you brought the suit?
16   A   No.
17   Q   How about anyone at the NRA?
18   A   No.
19   Q   How about any gun rights organizations?
20   A   No.
21   Q   There are some lawyers who are representing those
22   organizations in a state court case. Did you speak to those
23   lawyers from Corr Cronan?
24   A   I have only within the last two or three weeks spoken to
25   them.

11

Page 26

1  Q  And could you tell me what that conversation entailed?
2  A  Well, you know, it may be kind of a work product kind of
3     thing, but -- but just my communications with them are
4     basically just to kind of coordinate with them what each
5     group is doing.
6  Q  Okay.  Why don't we set that to the side for now.  So after
7     you found a city facility that did have a sign that was
8     posted prohibiting carrying of weapons, then what did you do?
9  A  Let me see, two days later on Friday, the 13th, that I -- I
10    sent an e-mail to a bunch of different parties, just saying
11    what I was planning to do the next day on the 14th.
12 Q  Okay.
13 A  And the next day on the 14th -- oh, I'm sorry.
14 Q  Go ahead.
15 A  Oh, I was just going to say next, on the 14th, I did what I
16    said I was going to do in the e-mail on the 13th.
17    MR. DUNNE:  So let's go ahead and mark as the first
18    exhibit a copy of an e-mail.
19    (Exhibit 1 marked for identification.)
20    MR. DUNNE:  Off the record for just a second.
21    (Off the record.)
22 Q  I'm handing you what has been marked as Exhibit 1.  Can you
23    identify that?
24 A  Yeah, that's a -- looks like it's mostly the e-mail I sent on
25    the 13th.

Page 27

1  Q  Okay.  If you want, go ahead and take a minute to review it,
2     and then let me know when you finished.
3  A  Okay.  Okay.
4  Q  This is the e-mail that you referred to and that you sent to
5     the members of City of Seattle government on November 13th?
6  A  Yes.
7  Q  And what was the purpose of sending the e-mail?
8  A  To -- to give notice to the city officials so that there
9     would be no surprise.  I didn't -- I didn't want to -- I
10    didn't want to surprise anyone.
11 Q  Okay.  Why were you concerned that you not surprise anyone?
12 A  Just because of the issue of -- of carrying a pistol, and
13    that can be considered provocative by some people, and I just
14    didn't want there to be any question about my intentions.
15 Q  In the last paragraph, you say that you will -- that you are
16    not looking for and do not want any kind of uncivil
17    confrontation, correct?
18 A  Yeah.
19 Q  And that you will fully and peacefully comply with any
20    instruction given to you at the Southwest Community Center by
21    law enforcement personnel or City of Seattle officials acting
22    within the scope of their capacities or duties, correct?
23 A  Yeah.
24 Q  And you actually tell them exactly what clothes you will be
25    wearing so they can identify you clearly, right?

Page 28

1  A  Baseball cap, yes, uh-huh.
2  Q  Yeah.  And all of that was to be very safe and up front with
3     them so they would understand who you are and what your
4     purposes and everyone would be able to have a civil
5     exchange as opposed to a confrontation, correct?
6  A  Yes.
7  Q  And why did you say that you thought that carrying a pistol
8     could be considered by some to be provocative?
9  A  Well, I mean, it is -- I mean, it is considered by some to be
10    provocative, but carrying a concealed pistol, of course, is
11    not, because absent me telling someone, nobody would know.
12    But, you know, some people -- you know, pistol -- a pistol
13    can be -- can be used to -- to, you know, for deadly --
14    deadly purposes, and it's not something that -- that you
15    should just irresponsibly mess around with.  So I just wanted
16    there to be no question whatsoever what I was doing.
17 Q  Now, I'm going to come back to the e-mail in a minute, but
18    let's just follow the train of events here.
19 A  Uh-huh.
20 Q  After you sent this e-mail, did you have any other
21    communications with members of the City of Seattle?
22 A  No.
23 Q  Did you have communications with members of any gun rights
24    organization such as Second Amendment Foundation or the NRA?
25 A  I spoke to Mr. -- what's his name, David Workman, I believe,

Page 29

1     from the Second Amendment Foundation, tried to contact me
2     that day, but I -- I think I called him back maybe a week
3     later, a few days later.
4  Q  And did you actually end up talking to Mr. Workman?
5  A  He actually ended up interviewing me for whatever publication
6     they put out.  At least, I mean, that's what he said was the
7     reason for his contact.
8  Q  Any other significant communications relating to the policy
9     before you actually went to the Southwest Community Center
10    that you can recall?
11 A  Aside from the press, no, and I would lump Mr. Workman into
12    the press.  That's -- that's the capacity I contacted him in.
13 Q  So, obviously, your November 13th e-mail, in addition to
14    being sent to members of the City of Seattle government, was
15    also sent to members of the press, correct?
16 A  Yes.
17 Q  And did you have a series of communications with members of
18    the press before you actually went?
19 A  Excuse me, yes, I was contacted by -- by several of them.
20 Q  Why did you send this e-mail to members of the press?
21 A  I thought it was a newsworthy subject.  The gun ban rule
22    itself was prominent in the news, pretty controversial.  I
23    thought it was something the press would be -- would be
24    interested in and the public would be entitled to know about.
25 Q  And so you also informed members of the press exactly what

Page 30

1    date and time that you would go to the Southwest Community
2    Center to challenge the gun policy, correct?
3    A    Yeah.  They were copied on the same e-mail that went to the
4    city officials.
5    Q    Okay.  And as predicted or forecast, on November 14th at
6    around noon, did you go to the Southwest Community Center?
7    A    Yes.
8    Q    All right.  And -- and when you got there, were members of
9    the press here?
10   A    Or they were arriving at roughly the same time, yes.
11   Q    Did you go right in, or did you speak to members of the press
12   before you went in?
13   A    Spoke to members of the press before I went in.
14   Q    Okay.  And about how much time did you spend speaking to
15   members of the press?
16   A    Approximately, 30 minutes.
17   Q    Do you recall what you told them?
18   A    No.  I mean, just basic -- they asked questions.  I
19   answered.  You know, basic background information on why I
20   was doing what I was doing, what I thought about the law,
21   stuff that they later reported on in the press.
22   Q    How many people from the press were there?
23   A    How many people, maybe 10 to 15-ish.
24   Q    Were there television cameras there as well?
25   A    Yes.

Page 31

1    Q    About how many TV cameras?
2    A    I believe three, three of the stations were there with
3    cameras.
4    Q    Was that each of the major Seattle stations?
5    A    Yes.
6    Q    Did you tell the press in those 30 minutes or so that you
7    spent with them that you actually had no purpose to come to
8    the Southwest Community Center other than to create standing
9    for a lawsuit against the city?
10   A    No.
11   Q    Okay.  But that was true, right, that you had no other
12   purpose but to do that?
13   A    No.  I was going to go to the dog show that was there at --
14   starting at noon.  My main -- my expectation was that I would
15   be turned away and not allowed to attend, but had I been
16   allowed to attend, I would have attended the costumed dog
17   show.
18   Q    When did you first learn there was a dog show there?
19   A    I think it was the 11th after I got home from driving past
20   the Southwest Community Center, and I looked on the Internet.
21   Q    So you looked on the Internet and found there was something
22   going on there, right?
23   A    Right.
24   Q    And -- but before you looked on the Internet, you had
25   intended to go to the Southwest Community Center at some

Page 32

1    point in the next several days to challenge the gun ban,
2    right?
3    A    Yes.
4    Q    And the gun -- the dog show just happened to be the event
5    that you chose.
6    A    Yes.
7    Q    Okay.  And but for the fact that you wanted to challenge the
8    gun ban, you probably wouldn't have attended the dog show,
9    would you?
10   A    Probably not.  I probably wouldn't have even found out that
11   there was a dog show.
12   Q    So it is fair to say that your principal purpose to go to the
13   Southwest Community Center was to create the circumstances by
14   which you could sue the City, right?
15   A    Yeah, I would say so.  That was my expectation.
16   Q    And you hadn't been to the Southwest Community Center
17   previously in over ten years; is that right?
18   A    Yes.
19   Q    Did you tell the press who were assembled there for this
20   event that you had visited parks and facilities maybe 10 to
21   20 times over the past 15 months and had never had occasion
22   to carry a pistol in any of those visits?
23   A    I -- I don't think I answered a question that specific.  I do
24   believe I was asked, you know, how many times I carry a
25   pistol, whether I've carried a pistol before in parks.  I

Page 33

1    believe I was asked those sorts of questions, and I answered
2    consistent with what I've told you.
3    Q    Do you recall actually seeing any news reports on whether you
4    had ever gone to parks in the last 15 months with a pistol?
5    A    I do not recall seeing such reports.
6    Q    Okay.  I have reviewed news reports, and I haven't seen any
7    reference.  Do you have any explanation why in the coverage
8    the press may have omitted those facts?
9    A    No.  You'd have to ask them.
10   Q    Do you have a specific recollection that you actually told
11   the press that it was not your -- your practice when visiting
12   parks and facilities to actually carry a concealed weapon?
13   A    I believe I -- I believe I did say something along those
14   lines to a question on that subject.
15   Q    Do you know which member of the press might have asked that
16   question?
17   A    I don't know.  They were all assembled together.
18   Q    So after about 30 minutes with the press, what did you do?
19   A    That's when I walked into the community center.
20   Q    Did you use the main entrance?
21   A    Yes.
22   Q    And were you wearing your Tacoma Rainier's baseball cap?
23   A    I was.
24   Q    So you were wearing the cap that you had told the City you
25   would be wearing?

13

Page 34

1   A   Yes.
2   Q   And were you wearing a concealed pistol?
3   A   I was.
4   Q   Did you use the main entrance to the community center?
5   A   Yes.
6   Q   Did you meet someone from the City when you got to the main
7       entrance?
8   A   After -- after going inside the building, I was promptly met
9       by -- I can't remember her name, but, yes, a city official,
10      security official, yeah.
11  Q   And then what happened?
12  A   She asked -- she confirmed that I was the person who had sent
13      the e-mail. I believe she confirmed that I was in fact
14      carrying a concealed pistol, you know, by asking me, because
15      it was concealed, and then she told me that I could not be in
16      the facility with the pistol, and told me that I would need
17      to turn around and leave.
18  Q   Okay.
19  A   Very polite about it.
20  Q   And was there any other discussion or communication other
21      than what you just relayed?
22  A   I think I asked her her name and her position, just to
23      confirm that, but aside from confirming each other's identity
24      and communicating the rule and asking me to go, that was
25      pretty much it.

Page 35

1   Q   Okay. So you -- was she dressed in any kind of clothing that
2       indicated that she worked for the City or she was a security
3       person?
4   A   No.
5   Q   Okay. And she identified herself to you; is that right?
6   A   Yes.
7   Q   And advised you of the policy, correct?
8   A   Yes.
9   Q   Asked you to leave, right?
10  A   Yes.
11  Q   And then you complied with her request, correct?
12  A   Yes.
13  Q   All right. And were there any other threats or coercions
14      made against you by this woman acting on behalf of the City?
15  A   No, she didn't say any -- no, she didn't -- she didn't say
16      anything threatening or coercive to me.
17  Q   When you left, what did you do?
18  A   When I left, the press still wanted to talk. So I believe I
19      went back to the same place I was standing outside and
20      probably talked to the press for another 20 to 30 minutes.
21      Then I went and had pizza with my family.
22  Q   So for -- the whole thing took approximately an hour?
23  A   Right, yes.
24  Q   By the way, where was your family while you were going into
25      the community center? Were they watching the dog show or

Page 36

1       were they watching you?
2   A   No, they were -- yeah, they were staying with me.
3   Q   And was it your plan to immediately go have food and pizza
4       with your family after presumably being asked to leave the
5       community center?
6   A   No. It's just, you know, when we were done talking to the
7       press, we just, you know, decided it was lunch time, and
8       that's when we decided to go have pizza.
9   Q   Okay.
10  A   No prior planning on that.
11  Q   Okay. Let's go back to Exhibit 1.
12  A   Uh-huh.
13  Q   I'm going to ask a couple questions about some statements
14      made here. In paragraph 2, you say that Seattle Parks and
15      Recreation Rule P 060 - 8.14 was promulgated in knowing and
16      blatant violation of state and federal law.
17          Do you see that?
18  A   Yes.
19  Q   What's the basis for your allegation that this rule was
20      promulgated in knowing violation of federal law?
21  A   Yeah, I'm not -- I'm not sure that there is a real -- the
22      knowing -- the knowing has more to do with the state
23      preemption law.
24  Q   Okay. And is your basis for saying that the policy or the
25      rule was promulgated in knowing violation of state law the

Page 37

1       Attorney General opinion on the subject?
2   A   Mostly, the Attorney General opinion and my own plain reading
3       of the preemption law myself.
4   Q   I see. A similar question, do you have any basis to allege
5       that Mayor Nickels was involved in promulgating the rule when
6       he was personally in knowing violation of federal law?
7   A   The knowing of federal law. You know, that, I don't -- you
8       know, I don't know. I -- I think that the -- I think that
9       the Second Amendment is actually quite clear in what it
10      says. The one lack of clarity was clarified by the Supreme
11      Court prior to this rule being put into effect. That is,
12      there being an individual right to carry -- to keep and bear
13      arms. So I think that had somebody done what I would
14      consider to be -- you know, required basic research prior to
15      promulgating a rule, then they would know that that rule
16      violated the Second Amendment because of the Heller case. So
17      that would go for both the City and the mayor.
18  Q   Okay. So -- so you believe that the Heller case is the
19      principal contusional authority that someone should refer to,
20      correct?
21  A   Certainly, with regard to whether or not the right to keep
22      and bear arms is an individual or collective right, the
23      Heller case answered that question, yes.
24  Q   Okay. But is it fair to say that you actually have no basis
25      one way or another to allege what Mayor Nickels knew or

Page 38

1    didn't know with respect to federal law?
2    A   No, I don't -- I don't have personal knowledge of that.
3    Q   And do you have indirect knowledge or documentary evidence or
4        anything?
5    A   No, I just have the opinion that one would have to either
6        have direct knowledge -- or one would have to either know
7        that what they were doing violated the law, or one would have
8        to have not done what I would consider basic inquiry into the
9        matter.  And I would hope that Mayor Nickels had at least had
10       someone do a basic inquiry into the matter.
11   Q   All right.  But just to be sure that we're clear, you don't
12       have a basis to allege that Mayor Nickels personally knew one
13       way or the other what the state of the law was, correct?
14   A   I have not done any discovery yet.  So at this time, I do not
15       have that knowledge.
16   Q   Okay.  In the next paragraph, you refer to the oath of
17       attorney that you took, correct?
18   A   Yes.
19   Q   And you say that you agreed in that oath to support the
20       constitution of the State of Washington and the constitution
21       of the United States, right?
22   A   Yes.
23   Q   And that is something you take seriously, correct?
24   A   Yes.
25   Q   And you also said that you were fully subject to the laws of

Page 39

1        the State of Washington and the laws of the United States,
2        and you agreed to abide by the same, correct?
3    A   Right.
4    Q   And do I take it from those solemn pledges and your
5        recitation of those in this e-mail that if the constitution
6        of the United States takes a position different than your
7        personal position, you would be bound by the constitution?
8    A   Yes.
9    Q   And do you also agree that the Supreme Court is the principal
10       arbiter of the meaning of the constitution of the United
11       States?
12   A   They would certainly be the final and binding arbiter, yes.
13   Q   So, for example, you believe that the Heller decision of the
14       United States Supreme Court at least defines some aspects of
15       the extent of an individual right under the Second Amendment
16       of the United States Constitution.  Is that fair?
17   A   Yes.
18       MR. DUNNE:  Do you want to take a two-minute break
19       and --
20       THE WITNESS:  Sure.
21       (Off the record.)
22       (Mr. Greer exited the room.)
23   Q   Mr. Warden, we can mark this if you want, but I have a -- one
24       of the news reports, and it's not all that important which
25       one.  I just wanted to ask you about a quote where you were

Page 40

1        quoted as saying on November 13th with respect to the City:
2        They know full well it's illegal, but they went ahead and did
3        it anyway.
4        Is that something that you said on November 13th?
5    A   I believe that's -- yes, I believe that's an accurate quote.
6    Q   And with respect to the knowledge that the policy was
7        allegedly illegal, are you relaying on anything other than
8        the language of the Second Amendment, the decision of the
9        Supreme Court in Heller and the Attorney General's opinion
10       and the state statute?
11   A   No.  Those -- yeah, I basically was talking about the
12       Attorney General's opinion when I made that statement.
13   Q   Okay.
14   A   Yes, nothing other than what you just said.
15   Q   And your lawsuit doesn't actually include a claim based on
16       the state preemption statute, correct?
17   A   Right.
18   Q   You originally included one, but you amended your complaint
19       to intentionally remove any claim based on Washington State
20       statute, right?
21   A   Right.  It contains the Washington contusional, but no
22       statutory, yes.
23   Q   All right.  And so at this time, as we sit here today, you
24       don't have a claim based on Title 9 of the RCW or any
25       Washington statute; is that right?

Page 41

1    A   Right.
2    Q   On November 13th, you were also quoted as saying that you
3        brought your gun to the community center because you're a
4        citizen who believes in the rule of law.
5        Is that something that you said?
6    A   In a sounds like it's accurate.
7    Q   And when you referred to the rule of law, what were you
8        referring to?
9    A   In that case, I was referring to Title 9, RCW Title 9, mainly
10       but also, you know, Second Amendment and the state
11       constitution.
12   Q   Okay.  Let me hand you a copy of your complaint.  I'm sorry,
13       the first amended complaint.
14   A   Okay.
15   Q   We're not going to mark this as an exhibit, because it's
16       already a pleading, but --
17   A   Do we need the actual exhibit somewhere, the first exhibit?
18   Q   That's fine.
19   A   Okay.
20   Q   Can you turn to page 5, please.
21   A   Okay.
22   Q   Would you mind reading the second sentence of paragraph 15?
23   A   Further, defendants substantially and comprehensively
24       infringed Second Amendment Rights after the U.S. Supreme
25       Court held that the Second Amendment guaranteed an individual

Page 42

1  right to bear arms, DC v. Heller citation, and after the
2  Ninth Circuit Court of Appeals held that the Second Amendment
3  applied to the states, Nordyke v. King, and then noting that
4  the Nordyke decision was vacated, and the U.S. Supreme Court
5  ruling in McDonald v. Chicago.
6  Q   And in addition to the language of the Second Amendment, are
7  those the two federal decisions that you principally relay on
8  to determine the content of the Second Amendment?
9  A   No.  Those are -- I mean, those are the -- those are what
10  I -- what I cited in here, mainly -- mainly Heller, because,
11  again, Nordyke is just being held to see what the Supreme
12  Court does again this year.  You know, I'm still doing
13  research.  There is a lot of cases out there, but for
14  purposes of the complaint, that was all I cited.
15  Q   Okay.  Is it your position at least that those two cases do
16  provide authority for a person such as yourself to enter city
17  owned facilities with a concealed weapon, under the Second
18  Amendment?
19  A   I -- well, I know -- the Heller case for me, you know,
20  demonstrates that there is a individual right in the Second
21  Amendment.  The Nordyke case is the would be the authority in
22  the Ninth Circuit, that that individual right applied to the
23  states.  That's -- those were the points I was making here.
24  Q   All right.
25  A   As far as what sort of individual Second Amendment right

Page 43

1  applied to the states, neither of those cases provide -- you
2  know, I'm not looking to them for authority.
3  Q   What are you looking to for authority?
4  A   For --
5  Q   Definition of the individual right.
6  A   Well, they both -- my point is Heller provides individual
7  right; Nordyke -- well, McDonald will decide in June whether
8  that individual right applies to the states, and that was
9  only my point was in paragraph 15, there is an individual
10  right, and it applies to states.
11  Q   Okay.  Let's go ahead and take a look at Heller then.  And
12  I'm handing you a copy of the United States Supreme Court
13  decision in District of Columbia v. Heller.
14  A   Okay.
15  Q   128 Supreme Court 2783, decided in 2008, and is this a case
16  that you have read in the past in preparing your complaint?
17  A   Yes.  Maybe not in its entirety as far as dissenting opinions
18  and concurring opinions, but, yes, I've reviewed the case.
19  Q   And if you turn to page 15 of the printout.
20  A   Right.
21  Q   At the very bottom of this page, it reads:  There seems to us
22  no doubt, on the basis of both text and history, that the
23  Second Amendment conferred an individual right to keep and
24  bear arms.  Correct?
25  A   That's what it says, yeah.

Page 44

1  Q   And is that the holding on which you personally rely?
2  A   Yeah.  I -- I don't know about, you know, one -- one sentence
3  in particular, but it is my -- my reading of the case overall
4  that it provides that the second amendment is -- provides an
5  individual right, not just a collective right.
6  Q   Go to the next page, please, and, you know, this is page 16
7  of the printout but page 2799 of the opinion.
8  A   Okay.
9  Q   Can you read the next sentence?
10  A   The one that starts with, Of course?
11  Q   Yes.
12  A   Of course, the right was not unlimited, just as the First
13  Amendment's right of free speech was not, see, for example,
14  United States v. Williams.  Thus, we do not read the Second
15  Amendment to protect the right of citizens to carry arms for
16  any sort of confrontation, just as we do not read the First
17  Amendment to protect the right of citizens to speak for any
18  purpose.
19  I'm sorry.  I may have read more than one sentence.
20  Q   That's okay.  That was perfectly appropriate.  And did you
21  understand that here Heller does not recognize an unlimited
22  right to bear and carry arms?
23  A   Oh, sure.  Yeah, no constitutional right is unlimited.
24  Q   All right.  And by that, that means that governments are
25  entitled to -- or have authority to enact some degree of

Page 45

1  regulation, correct?
2  A   Absolutely.
3  Q   All right.  And did Heller actually discuss some of the
4  parameters of that regulation that were recognized?
5  A   I don't remember specifically, you know, without looking,
6  without being cited directly to it, but might have.
7  Q   Why don't you turn to page 29 of the printout which is page
8  2816 and 2817 of the opinion.
9  A   Okay.
10  Q   Do you see under subheading Roman Numeral III --
11  A   Yes.
12  Q   -- there is a paragraph that begins, Like most rights.
13  A   Yes.
14  Q   And here the Supreme Court says again the right secured by
15  the Second Amendment is not unlimited, correct?
16  A   Yes.
17  Q   And further on in the paragraph, it says that the majority of
18  the 19th-century courts considered the question held that
19  prohibitions on carrying concealed weapons were lawful under
20  the Second Amendment or state analogues, correct?
21  A   Yes.
22  Q   And do you have any information or reason to believe that the
23  Supreme Court's statement there is incorrect?
24  A   I have no reason to believe that.
25  Q   Okay.  So do you agree that under the Second Amendment,

Page 46

1    prohibitions on carrying concealed weapons are lawful?
2    A    They can be, depending on the circumstances.
3    Q    Okay.  And further on, the Supreme Court goes on to say that
4         nothing in our opinion should be taken to cast doubt on
5         long standing prohibitions on the possession of firearms.
6         And then it engages in a list of examples, correct?
7    A    Yes.  Felons, mentally ill, et cetera, right.
8    Q    And one of the examples is laws forbidding the carrying of
9         firearms in sensitive places such as schools and government
10        buildings, correct?
11   A    Yes.  That's what it says.
12   Q    So under the constitution as interpreted by the Supreme
13        Court, do you agree that governments have authority to pass
14        laws forbidding the carrying of firearms in sensitive places?
15   A    Yes.
16   Q    Okay.  And sensitive places would include schools and
17        government buildings, correct?
18   A    Well, those are two examples that they give.
19   Q    Okay.  And there may be others?
20   A    There may be others, sure.
21   Q    All right.
22   A    There may -- in some circumstances, a regulation in a school
23        or government building may not pass strict scrutiny, but that
24        certainly is an example of places where it could.
25   Q    Okay.  And do you have any authority, any federal authority

Page 47

1         from the Supreme Court holding in any situation in the last
2         200 years that a law forbidding the carrying of firearms in a
3         government building was unconstitutional?
4    A    I'm not familiar with any ruling of that nature, no.
5    Q    How about any federal court of appeals ruling to that effect?
6    A    I'm not -- you know, I'm not aware of any.
7    Q    Okay.  So given this statement by the Supreme Court, are you
8         aware of any legal authority that governments may not
9         restrict the carrying of firearms in government buildings
10        under the federal constitution?
11   A    I'm sorry.  Okay.  Can you say that again, please.
12   Q    Yeah.
13   A    There is a lot of, "nots" in there.
14   Q    In light of this statement in the majority opinion in
15        District of Columbia v. Heller, are you aware of any federal
16        authority that prohibits governments from restricting the
17        carrying of firearms in government buildings?
18   A    No.
19   Q    And based on the oath that we have just reviewed that you
20        took as an attorney, would you agree that this is the law of
21        the land as reported in Heller?
22   A    Heller -- yeah, Heller is the law of the land.
23   Q    Okay.  And the law of the land under the Second Amendment is
24        that the Second Amendment allows governments to forbid the
25        carrying of firearms in government buildings, correct?

Page 48

1    A    Yes.
2    Q    Okay.
3    A    Under -- yeah, under the right circumstances, sure.
4    Q    And the Southwest Community Center is owned by the City of
5         Seattle to the best of your knowledge, right?
6    A    Yes.
7    Q    And the Southwest Community Center is a government building
8         then, right?
9    A    I -- yeah, I think you could say that.
10   Q    And so the City of Seattle's policy with respect to the
11        Southwest Community Center is a policy that is within the
12        contours we've just discussed in District of Columbia v.
13        Heller, correct?
14   A    No, because I don't think it would pass any level of
15        scrutiny.  So, I mean, we could get into a legal discussion
16        about levels of scrutiny of state regulation of
17        constitutional rights, but I don't know that that's what
18        we're here to do.
19   Q    Are you aware of some other federal authority that we haven't
20        reviewed other than the Supreme Court's decision in Heller?
21   A    Regarding government Buildings?
22   Q    Correct.
23   A    Not at this time.
24   Q    Are you aware of any Supreme Court case that holds that an
25        individual has a right to bear arms under the Second

Page 49

1         Amendment in any place other than their home?
2    A    Supreme Court case?
3    Q    Uh-huh.
4    A    I'm not aware of any, but I haven't done the research yet.
5    Q    If you turn to --
6    A    I'll be happy to stipulate that that's an area of law that is
7         up in the air right now, and that this case raises a question
8         that is not settled.
9    Q    Well, I don't think so.  I think this case raises a question
10        that's firmly within the scope of Heller.
11   A    Okay.
12   Q    And so I would reject your stipulation.
13   A    Okay.
14   Q    Why don't you go ahead and turn to page 33, and I'm going to
15        refer you to the very last paragraph.
16   A    In sum?
17   Q    Yeah.  Why don't you go ahead and read that sentence.
18   A    In sum, we hold that the District's ban on handgun possession
19        in the home violates the Second Amendment, as does its
20        prohibition against rendering any lawful firearm in the home
21        operable for the purpose of immediate self-defense.
22   Q    Okay.  So there are two phrases in that sentence, correct?
23   A    Yeah.
24   Q    The first one refers to the district's ban on handgun
25        possession in the home, right?

13 (Pages 46 to 49)

17

Page 50

1   A  Yes.
2   Q  And so the Supreme Court's holding is that a ban of handgun
3      possession in a person's home violates the Second Amendment,
4      correct?
5   A  Yes.
6   Q  And then it goes on to say that prohibiting lawful firearms
7      in the home or prohibiting --
8   A  Operable.
9   Q  -- operable lawful firearms in the home for the purpose of
10     self-defense is also a violation of the Second Amendment,
11     correct?
12  A  Yes.
13  Q  So in Heller, the Supreme Court has struck down a law that
14     affects the rights to own handguns in the home, correct?
15  A  Yes.
16  Q  Can you point to any authority in this -- in this decision or
17     any holding of this decision that extends beyond the home?
18  A  No. I think this decision has to do with the home.
19  Q  Okay. Let's go ahead and ask you to now look at the Ninth
20     Circuit decision in Nordyke v. King, please.
21  A  Okay.
22  Q  Oh, I was going to give you these. These aren't exhibits.
23  A  Right.
24  Q  So we'll just use what you've got. Is Nordyke v. King a case
25     that you read in preparing the complaint that you filed in

Page 51

1      this lawsuit?
2   A  Yeah, I reviewed it.
3   Q  Okay. And it's also the case again that you cite in
4      paragraph 15 of your first amended complaint, right?
5   A  I believe so. Yes.
6   Q  And are you aware that Nordyke addressed constitutionality of
7      a county ordinance that forbids the carrying of firearms on
8      county property?
9   A  Yes, in California, I believe, yes.
10  Q  Okay. And in doing so, Nordyke also reviewed Heller and
11     applied Heller to the circumstances, correct?
12  A  Yes.
13  Q  And are you aware that Nordyke also held that a county has
14     the authority to forbid the carrying of firearms in sensitive
15     places?
16  A  I hadn't focused on that part, but that's -- yeah, wouldn't
17     surprise me, I guess.
18  Q  Okay.
19  A  It's in California, a different law than here.
20  Q  Well, it's interpreting the federal constitution, right?
21  A  Well, basically, but I don't think the court would say that a
22     county in the State of Washington has authority to do
23     anything like that, because in fact a county doesn't in the
24     State of Washington.
25  Q  Well, we're --

Page 52

1   A  We can't -- we can't pretend that the preemption statute
2      doesn't exist simply because I don't have a claim
3      specifically based on it.
4   Q  Let's just focus on your constitutional claim.
5   A  Right.
6   Q  Okay? Because you don't have a claim under Washington State
7      statutes. We've established that, correct?
8   A  Yeah, that's what I just said too.
9   Q  Okay. So we'll set that aside for now as irrelevant. We're
10     going to focus on federal law, and you agree, don't you,
11     that -- that in this Ninth Circuit opinion the Ninth Circuit
12     held that counties may forbid carrying of fire arms in
13     sensitive places, including fairgrounds and county property,
14     correct?
15  A  With respect to the Second Amendment, yes.
16  Q  The qualification is accepted. That's all -- that's all
17     we're talking about.
18  A  Right, right.
19  Q  And are you aware that the ordinance prohibiting guns in --
20     in sensitive places had the effect of prohibiting guns in
21     recreational areas and historic sites and parking lots and
22     public buildings?
23  A  Yeah, I -- I don't remember specifically that part, but --
24     but I don't remember it not either.
25  Q  Okay. Well, let's go ahead and look at page 20.

Page 53

1   A  Sure.
2   Q  And refer you to the second full paragraph, which is --
3      quotes from pages 459 and 460 of the opinion. Why don't you
4      go ahead and read that paragraph and the following paragraph
5      to yourself, and let me know when you've finished.
6   A  Okay.
7         (Witness reading document.)
8   A  Okay.
9   Q  So in this decision, the Ninth Circuit refers again to a
10     county ordinance, correct?
11  A  Yes.
12  Q  And that county ordinance forbade possession of firearms in
13     county property, correct?
14  A  Yeah.
15  Q  And also open space venues such as county-owned parks and
16     recreational areas, correct?
17  A  Yeah.
18  Q  And the Ninth Circuit observed that these are gathering
19     places where high numbers of people might congregate, right?
20  A  Yes.
21  Q  And, specifically, observe that fairgrounds host numerous
22     public and private events throughout the year, and a large
23     number of people attend those events, right?
24  A  Yes.
25  Q  And then the Ninth Circuit stated, quote, Although Heller

Page 54

1    does not provide much guidance, the open, public spaces the
2    county's ordinance covers fit comfortably within the same
3    category as schools and government buildings, end quote,
4    correct?
5    A    Yes.
6    Q    So do you understand that in this opinion the Ninth Circuit,
7    relying on the precedent of the Supreme Court in Heller held
8    that a county ordinance forbidding possession of firearms in
9    open, public spaces is not unconstitutional under the Second
10   Amendment?
11   A    Yes.
12   Q    And are you aware of any higher federal authority to the
13   contrary?
14   A    I am not aware of that, no.
15   Q    And they also summarized Heller to say that the core of the
16   right that Heller analyzed was the right of an individual to
17   defend themselves in their homes, correct?
18   A    Yes.
19   Q    And are you aware of any federal authority that recognizes
20   under the Second Amendment a right to bear arms for self-
21   defense outside of the home?
22   A    I'm not aware of any right now, no.
23   Q    And then the Ninth Circuit goes on to say that prohibiting
24   firearm possession on municipal property fits within the
25   exception from the Second Amendment for sensitive places that

Page 55

1    Heller recognized, correct?
2    A    Yes.
3    Q    Are you aware of any federal authority that contradicts or
4    supersedes that particular holding?
5    A    No.
6    Q    Let's go ahead and put that aside.  Can I have you pick up
7    your complaint again, please.
8    A    Sure.  Where are we at?
9    Q    Let's go to page 8, your second claim for relief under the
10   Equal Protection Act.
11   A    Okay.
12   Q    Or, I'm sorry.  Under the 14th Amendment.
13   A    Okay.
14   Q    In this claim you allege that defendants have violated and
15   are continuing to violate the plaintiff's rights to equal
16   protection of the laws, correct?
17   A    Yes.
18   Q    And my question simply is what classification do you contend
19   that defendants have made to deprive you of the equal
20   protection of the laws available to other citizens?
21   A    What classification?
22   Q    Right.
23   A    Those carrying firearms.
24   Q    So just -- and we're just trying to understand exactly what
25   this is, so we would be prepared to address it.  So in your

Page 56

1    view, the policy that excludes persons carrying firearms
2    discriminates against those people?
3    A    Yeah.
4    Q    Okay.  By comparison to people who don't carry firearms?
5    A    Yes.
6    Q    And you're not alleging that you're a member of any suspect
7    class based on race, gender, ethnicity, national origin,
8    religion, anything like that, correct?
9    A    That is correct.
10   Q    Okay.  So your -- your claim is based entirely on the
11   exclusion of people with firearms, correct?
12   A    Yes.
13   Q    And you do acknowledge, however, that you would be able to
14   gain entry if you were not carrying a firearm, right?
15   A    Yes.
16   Q    And that carrying a fire arm is not an inherent trait of
17   personality or -- or a human condition, but a -- a decision,
18   right?
19   A    Right.
20   Q    And it's something that's a -- for lack of a better word, its
21   conduct, correct?
22   A    Yeah, it's not a -- it's not a trait like gender or race or
23   anything like that.
24   Q    Let's go to the exhibits to the amended complaint, and let's
25   go to Exhibit C, please.

Page 57

1    A    Okay.
2    Q    Can you tell me what Exhibit C is?
3    A    It's a copy of the parks department rule, the gun ban rule.
4    Q    And this is the particular rule that you are challenging,
5    right?
6    A    Yes.
7    Q    And are you challenging -- well, let me ask a different
8    question.  Let's go to Section 1.6.
9    A    All right.
10   Q    And you understand that there are -- there is an introduction
11   in findings for the rule, right?
12   A    Yes.
13   Q    And that the findings recite the basis for the rule and
14   policy that the City has adopted, correct?
15   A    Yeah, I believe that's the intent.
16   Q    Okay.  And so one of the findings is in paragraph 1.6, right?
17   A    Okay.
18   Q    And that says that safe and secure use of department
19   facilities is disturbed by the threat of intentional or
20   accidental discharge of firearms in the vicinity of children,
21   right?
22   A    Yes.
23   Q    And you're aware that there are all across the country every
24   month, every week, perhaps every day, intentional and
25   accidental discharges of firearms in the vicinity of

Page 58

1   children, right?
2   A   I'm not familiar with the frequency, but, sure, that happens.
3   Q   That happens with sufficient regularity that it should be a
4       matter of public concern, right?
5   A   Again, I don't know the regularity, but it would be a
6       concern, yeah.
7   Q   Okay.  And paragraph 1.6 goes on to refer to particular
8       unforeseen circumstances such as the escalation of disputes
9       among individuals carrying firearms.  You're aware that that
10      happens from time to time, correct?
11  A   Sure.
12  Q   Because carrying firearms can itself be a provocative act,
13      right?
14  A   Not that I know of.
15  Q   Did you testify earlier that -- that carrying firearms can be
16      perceived by some as a provocative act?
17  A   No, what I -- what I thought I said was that carrying a fire
18      arm into a facility with the intention of seeing if a rule
19      applied to you could be seen as provocative.
20  Q   Okay.
21  A   I certainly think carrying an exposed firearm could be
22      perceived as provocative.
23  Q   About exposing a concealed firearm, that could be conceived
24      of as provocative as well, correct?
25  A   Sure, because it would no longer be concealed at that point.

Page 59

1   Q   Yeah.
2   A   Yeah.
3   Q   That it would indicate an intention to make use of it in some
4       way, right?
5   A   Ah, I think that's going a bit far.
6   Q   So another circumstance is the accidental discharge of
7       firearms in the vicinity of children.  You're aware that that
8       happens with some regularity, right?
9   A   I'm sure it does, and not just children, yeah.
10  Q   You teach a course in the safe handling of firearms, correct?
11  A   Yeah.
12  Q   And that's because occasionally the mishandling of firearms
13      causes injury to people, right?
14  A   Sure, yeah.
15  Q   Were aware of --
16  A   Inherent -- there is an inherent danger of that happening.
17  Q   Yeah.  Were you aware of the incident at Westlake Center
18      several weeks ago where a person carrying a concealed weapon
19      dropped his pistol on the floor and it discharged and fired
20      and shot himself in the leg?
21  A   I heard that report, yeah.
22  Q   Yeah.  So that would be an example of the mishandling of a
23      fire arm, right?
24  A   It certainly sounds like one, yeah.
25  Q   Okay.  It also refers to the unsafe, temporary storage or

Page 60

1   placement of firearms that may be found and accidentally
2   discharged by children and youth, correct?
3   A   Yes.
4   Q   That's a circumstances that happens from time to time,
5       correct?
6   A   Yes.
7   Q   And the intimidation that occurs when someone openly displays
8       firearms in the presence of youth and children.  I think
9       that's something we've touched on, correct?
10  A   Yeah.  That can be -- that can be perceived as provocative or
11      threatening, yeah.
12  Q   So all those are circumstances that are known to occur,
13      correct?
14  A   Yes.
15  Q   And it is rational for the City to take action to reduce the
16      occurrence of those circumstances, correct?
17  A   You know, again, under certain circumstances, it would be
18      rational -- it would be rational for the government to be
19      concerned with those incidents, sure.
20  Q   If you go to paragraph 1.8, please.
21  A   Yes.
22  Q   Here the City makes a finding that many injuries to children
23      by firearms occur when children are playing and gain access
24      to firearms.  You're aware that that happens with some
25      frequency, correct?

Page 61

1   A   Yes.
2   Q   Even though the firearms are legally possessed and permitted,
3       and no violation of law, correct?
4   A   Yes.
5   Q   And in fact part of the purpose of the class that you teach,
6       I'm sure, is to instruct people as to the safe handling and
7       storage of firearms to reduce those injuries, correct?
8   A   Yes.
9   Q   But you can't be sure that in every circumstance the firearms
10      are safely handled and stored, correct?
11  A   Correct.
12  Q   And in fact the people who enter Seattle facilities don't
13      ever have to take any kind of training regarding the safe
14      storage and handling of firearms, correct?
15  A   Correct, yeah.
16  Q   And if they go in with a concealed pistol under their jacket
17      and they decide to go swing on a swing, or up and down on a
18      teeter-totter, or go swimming in a pool, there is no
19      particular law as to where and when and how they must store
20      their gun, correct?
21  A   I believe that's correct.
22  Q   They don't have to store it in a locked place, do they?
23  A   You know, not -- I'm frankly not a hundred percent sure.  I
24      know if you leave your pistol in your car, it's supposed to
25      be locked or in an opaque container, but --

Page 62

1  Q  Right.
2  A  Yeah.
3  Q  And so if someone were to take their firearm off so that they
4     could use play facilities at a children's playground or go
5     swimming, that firearm could be stolen, correct, if not
6     stored properly?
7  A  Yes.
8  Q  Could be found by children, correct?
9  A  Right.
10 Q  Could be accidentally discharged, correct?
11 A  I would think so.
12 Q  And so it's rational for the City to be concerned about those
13    circumstances, isn't it?
14 A  It's rational for anybody to be concerned about those.
15 Q  Yeah, okay.  And the City is no different.  It's rational for
16    the City to think about those things, right?
17 A  Ah, sure.
18 Q  And in general it's rational for the City to be concerned
19    that adults not leave their firearms unattended or properly
20    stored in city buildings or parks, correct?
21 A  The City and every other entity in the world, yes.
22 Q  Okay.  If you look at paragraph 1.9, the City makes the
23    finding that the presence of even otherwise lawfully
24    possessed firearms increases the likelihood of gun violence
25    to resolve disputes.

Page 63

1  A  I see that.
2  Q  That would not otherwise involve a threat to life or grievous
3     bodily harm.  Do you see that?
4  A  Yes.
5  Q  Do you agree with that?
6  A  Ah, not necessarily.  I don't know where that -- the basis of
7     that is.
8  Q  Well, you can't experience gun violence without a gun, can
9     you?
10 A  No, you cannot.
11 Q  So to have gun violence, you must have a firearm, right?
12 A  Yes.
13 Q  And a firearm is a deadly weapon, right?
14 A  Yes.
15 Q  So isn't it logical and rational to find that the presence of
16    lawfully possessed firearms increases the likelihood of gun
17    violence?
18 A  Well, I guess, "lawfully possessed," is the compound word I
19    am not sure about.  Clearly, the presence of guns increases
20    the likelihood of gun violence.  In fact, it's a necessary
21    condition.  My question is with the, "lawfully possessed"
22    portion.
23 Q  Okay.  Do you agree that it's rational for the City to be
24    concerned about the presence of firearms and the possibility
25    that the likelihood of gun violence may increase?

Page 64

1  A  Rational, yes.
2     MR. DUNNE:  Let's take a quick break, and then I think I
3     got about five minutes left, and we'll get you out of here.
4     THE WITNESS:  All right.  Okay.
5     (Off the record.)
6  Q  Just a couple more questions before we end up, Mr. Warden.  I
7     looked you up on Google and found that you've become a
8     blogger recently; is that right?
9  A  Yes.
10 Q  So it appears that you became a blogger in November 2009?
11 A  Yeah.
12 Q  Was that --
13 A  Very end of November, I think.
14 Q  So that was a week or two after you actually visited the
15    community center?
16 A  Right.
17 Q  Okay.  And in your personal profile you have the following
18    quote:  "As long as the world shall last there will be
19    wrongs; and if no man objected and no man rebelled those
20    wrongs would last forever."  From Clarence Darrow, right?
21 A  Yeah.
22 Q  And you mentioned your favorite movies.  The first one you
23    mention here is Dirty Harry, right?
24 A  Yes.
25 Q  Why did you pick that one?

Page 65

1  A  I -- I don't know.  I think I had probably just put the
2     pistol-packing attorney nickname up here or something, but
3     it's one of many movies in my top shelf, I guess.
4  Q  Okay.  We have at least one favorite book in common, Light in
5     August, so --
6  A  Ah, good, yeah.
7  Q  -- that's interesting.
8  A  Uh-huh.
9  Q  And you've written at least a couple of blogs, one on the Wah
10    Mee massacre and the parole decision there, and another on
11    the recent tragedy in Lakewood, right?
12 A  Yes.
13 Q  So have you written any others since December 1st, 2009?
14 A  No.
15 Q  Christmas season keeping you busy?
16 A  Yeah, yeah, and was at Atlanta last week, I think I
17    communicated, so busier than I would hope, than I would like.
18 Q  I just had a quick question or two about lessons from
19    Lakewood.  This again is the tragedy of the four police
20    officers --
21 A  Yeah.
22 Q  -- who were murdered in Lakewood by a career criminal, right?
23 A  Yes.
24 Q  And if you go to the third page of the blog, and --
25 A  Okay.

21

Page 66

1  Q   The last paragraph, can I ask you just to read that paragraph
2      into the record?
3  A   The one fact is certain?
4  Q   Ah --
5  A   The last full paragraph on the page you were talking about?
6  Q   Page 3. In fact, we should -- we should probably -- as long
7      as I'm going to have you read something, I might as well go
8      ahead and mark it as an exhibit so that's clear. Let's mark
9      this as Exhibit 2, and it's entitled, The Critical Thinker.
10         (Exhibit 2 marked for identification.)
11  Q   Can you identify Exhibit 2, please.
12  A   Exhibit 2 looks like my blog titled, The Critical Thinker.
13  Q   And your -- what do they call these, your nom de guerre is
14      pistol-packing attorney?
15  A   Yeah. That's what one of the newspaper headlines at least
16      said, which is kind of, you know, sounds cool, I guess.
17  Q   Okay. Can you turn to the third page, please.
18  A   Yes.
19  Q   At the very bottom there is a paragraph that begins, What if
20      the baristas, could you read that paragraph, please.
21  A   All right. "What if the baristas at the unfortunate coffee
22      shop had been carrying concealed pistols and knew how to
23      safely and competently use them? What if at least one of
24      them, after Clemmons turned his back and after they moved out
25      of immediate harm's way, was able to take him down? What if

Page 67

1      today we were celebrating the heroic life-saving actions of a
2      concealed pistol carrier rather than mourning the horrific
3      and senseless loss of four police officers? It happens.
4      Legally armed citizens disrupted the November 2005 Tacoma
5      Mall rampage; an armed off-duty out-of-jurisdiction Ogden
6      police officer quickly ended the February 2007 shooting spree
7      in Salt Lake City."
8  Q   You believe strongly in the rights under the Second
9      Amendment, correct?
10  A   Yeah. Under all constitutional rights, but, yes.
11  Q   Yeah. And it sounds from your blog here as though you
12      believe that one of the justifications for allowing citizens
13      to carry firearms is their ability to use those firearms to
14      stop criminal activity.
15  A   Yes, uh-huh.
16  Q   Do you know how frequently that happens in any given year?
17  A   No.
18  Q   Of the 10,000 or so gun deaths that occur every year, do you
19      know about how many of them are deaths of criminals who are
20      shot in the act of committing some felony?
21  A   No.
22  Q   And do you know whether the coffee shop here actually had a
23      policy prohibiting its employees from carrying weapons while
24      they were on duty for the protection of themselves and
25      customers?

Page 68

1  A   No, I don't know.
2  Q   Do you know whether it in fact is common for employers to
3      prohibit their employees from carrying firearms while --
4      while working?
5  A   I know in the federal sector where I work weapons are not
6      allowed in federal facilities. I've read some cases
7      regarding, I think, county bus drivers, but, no, it -- I'm
8      sure that there are plenty of employers who prohibit
9      employees from carrying pistols while on duty.
10  Q   And so the point of this blog was in part to say if the
11      baristas had been carrying firearms, they may have been able
12      to take action to prevent a horrific crime, correct?
13  A   Sure.
14  Q   But you -- you recognize the irony here, don't you?
15  A   Irony?
16  Q   Yeah. That there were four people in that coffee shop who
17      were carrying pistols?
18  A   Yes, the targets, right.
19  Q   And each of those people received the best training that
20      Washington can provide as to how to prevent crime?
21  A   Sure.
22  Q   And, in fact, they were each wearing bullet proof vests at
23      the time, right?
24  A   I'm not aware of that, but it wouldn't surprise me.
25  Q   And notwithstanding the fact that they were as well-trained

Page 69

1      as a citizen can be and fully armed and actually there
2      preparing to go out on duty, each of them was unable to stop
3      that crime in process, right?
4  A   Well, they were certainly unable to save their own lives. I
5      understand one of them -- one of them shot the guy in the
6      stomach but -- right.
7  Q   So that was my reference. Do you understand the irony?
8  A   Well, I understand that if you're snuck up on from behind
9      it's hard to defend yourself. My understanding -- again, I
10      wasn't there was that the baristas saw Maurice pull a gun,
11      then turn around and started walking towards the officers,
12      which presented an opportunity not available to the officers.
13  Q   That tends to be what criminals do with their guns, is to
14      pull them before you have a chance to pull yours.
15  A   That certainly, I believe, would be a good strategy.
16         MR. DUNNE: Okay. Dave, is there anything you want to
17      talk about before we conclude?
18         MR. KEENAN: I got nothing.
19         MR. DUNNE: Okay. Mr. Warden that's all I have. So I
20      wanted to thank you for your time, and --
21         THE WITNESS: Sure.
22         MR. DUNNE: -- I don't know if you have anything that
23      you wanted to put on the record before we conclude.
24         THE WITNESS: I'd like to cross-examine myself. No.
25         (Laughter.)

18  (Pages 66 to 69)

Page 70

1    MR. KEENAN: And then object.

2    MR. DUNNE: I can tell you a funny story about that when

3  we're off the record.

4    THE WITNESS: Okay.

5    (Off the record.)

6    MR. DUNNE: This will conclude the deposition of

7  Mr. Warden.

8    (Whereupon, at 11:53 a.m. the deposition was concluded.)

9    (Signature was reserved.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 71

1         C E R T I F I C A T E

2  STATE OF WASHINGTON        )

3  COUNTY OF KING        )

4    I, the undersigned Notary Public in and for the State of

5  Washington, do hereby certify:

6    That the annexed transcript of Tuesday, December 22, 2009

7  deposition of ROBERT C. WARDEN was taken stenographically by me

8  and reduced to typewriting under my direction;

9    I further certify that I am not a relative or employee or

10 attorney or counsel of any of the parties to said action, and that

11 I am not financially interested in the said action or the outcome

12 thereof;

13    I further certify that the annexed Tuesday, December 22, 2009

14 deposition of ROBERT C. WARDEN is a full, true and correct

15 transcript, including all objections, motions and exceptions of

16 counsel, made and taken at the time of the foregoing proceedings.

17    IN WITNESS WHEREOF, I have hereunto set my hand and affixed

18 my signature this 28th day of December 2009.

19

20

21

22

23    _____

     Notary Public in and for the State of

     Washington, residing at Seatac.

24    My commission expires 2/14/10

     CSR License No. 2616

25

Page 72

1         S I G N A T U R E

2    I, ROBERT C. WARDEN, hereby certify that I have read the

3  foregoing transcript of my deposition taken Tuesday, December 22,

4  2009, and that the corrections, if any, were noted on the enclosed

5  correction sheet, and with those changes, the same is now a true

6  and correct transcript of my deposition testimony.

7

8

9

10

11    _____

12

13

14

15

16  STATE OF WASHINGTON        )

                               ) ss.

17  COUNTY OF_____)

18

19    SUBSCRIBED AND SWORN to before me this _____ day of

20  _____, 20___.

21

22

23    _____

     Notary Public in and for the State of

24    Washington, residing at _____

     My Commission expires_____

25

1         DEPOSITION CORRECTION SHEET

2  WITNESS: ROBERT C. WARDEN: 12/22/09

3  WARDEN V. NICKELS; CITY OF SEATTLE, NO. C09-1686 MJP

4  PAGE/LINE    CORRECTION

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23  RETURN CORRECTION SHEET AND SIGNATURE PAGE TO:

24      LAURIE HECKEL, CSR, RPR

        17832 50TH COURT SOUTH

25      SEATAC, WASHINGTON 98188

# EXHIBIT B

Westlaw.                                                                    NewsRoom

11/14/09 STLTI (No Page)                                                    Page 1


11/14/09 Seattle Times (Pg. Unavail. Online)
2009 WLNR 22940655

Seattle Times, The
Copyright 2009 Seattle Times

November 14, 2009

Kent man challenges Seattle Mayor Greg Nickels' gun ban
Bob Young
Seattle Times

Nov. 14--A gun-toting Kent man was asked to leave a West Seattle community center today and he said he accomplished a key step toward legally challenging Mayor Greg Nickels' ban on firearms in city parks, community centers and other facilities.

After a short, civil showdown with a parks department employee, Bob Warden left the Southwest Community Center with a Glock pistol holstered inside his leather jacket. Warden, who holds a concealed-weapons permit, had come to the center to protest Nickels' gun ban. A licensed attorney, Warden had alerted the city and press to his noon protest.

Warden, 44, said the city's gun ban violates state and federal law. Four gun-rights groups and five individuals said last month they are suing the city and Nickels over the ban. But Warden believes those plaintiffs lack standing to challenge the city's ban because they hadn't personally been evicted from city property for carrying a gun.

He said he expects to file a lawsuit and have a judge hear his complaint: "I think this is a pretty good bang for the buck in terms of standing up for our rights."

He said his confrontation with city officials went as anticipated. Followed by a pack of reporters and cameras, Warden entered the community center shortly after noon. He was greeted by Lisa Harrison, a parks security employee, who asked him to leave. Under the watchful eye of several Seattle police officers, Warden promptly complied, as he said he would.

A labor-relations specialist with the federal government, Warden said he is not a member of the NRA, not a gun-rights activist, and not a political conservative. He maintained his protest was "something a good citizen should do."

With so many men and women "fighting for our rights overseas, it seems kind of offensive for people back here to just give them away," Warden said.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

11/14/09 STLTI (No Page)                                                    Page 2

The ban went into effect last month in certain park facilities and eventually will include hundreds of play-grounds, community centers, sports fields, swimming pools and water-play areas.

Nickels proposed the ban to protect children, but the move quickly drew fire from gun-rights advocates who questioned its legality.

State Attorney General Rob McKenna has said that state law pre-empts local authority to adopt firearms regula-tions, unless specifically authorized by law.

Nickels said state law does not prohibit a property owner from imposing conditions on the possession of fire-arms on his or her property. The mayor argues that a municipal property owner such as Seattle may impose lim-its on firearms as a condition of entry or use of particular facilities, especially those where children and youth are likely to be.

A Nickels spokesman said the city expects to prevail against those who challenge the gun ban. "We'll meet them in the legal arena. We are very confident in our our case and look forward to arguing it," said Alex Fryer.

Warden disagreed.

"Mr. Nickels never presented evidence how a legally carrying citizen is a threat to anyone" in city parks, Warden said. "The mayor has not presented any argument how a gun ban like this would prevent bad guys from sneaking into [a city facility] with a weapon."

His retired parents were on hand to support him. Fred and Barb Warden, also of Kent, said they taught their son to stand up for what he believes in. "He's always had the courage of his convictions and we respect what he's do-ing," his mother said.

Warden said he has never fired a weapon outside a shooting range. He also couldn't recall any other laws he had publicly protested. "I expect by this time next week everyone will forget me," he said.

Bob Young: 206-464-2174 or byoung@seattletimes.com

Staff reporter Susan Gilmore contributed to this story.

---- INDEX REFERENCES ----

COMPANY: KENT INDUSTRIAL CO LTD

NEWS SUBJECT: (Gun Rights & Regulations (1GU97); Social Issues (1SO05); Government (1GO80); Local Government (1LO75))

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

11/14/09 STLTI (No Page)                                                                                    Page 3

REGION: (North America (1NO39); Washington (1WA44); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (KENT; NRA; SOUTHWEST COMMUNITY CENTER; STATE ATTORNEY) (Alex Fryer; Bob Warden; Bob Young; Fred and Barb Warden; Greg Nickels; Lisa Harrison; Nickels; Nov; Rob McKenna; Staff; Susan Gilmore; Warden)

Word Count: 738
11/14/09 STLTI (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

**NewsRoom**

11/14/09 STLPI (No Page)

Page 1

11/14/09 Seattle Post-Intelligencer (Pg. Unavail. Online)
2009 WLNR 22946910

Seattle Post-Intelligencer (WA)

Copyright 2009 Seattle Post-Intelligencer (http://seattlep-i.com). All rights reserved. Reproduced with permission of the Seattle Post-Intelligencer.

November 14, 2009

Section: Local

### Man carries gun into community center to protest ban

SEATTLEPI.COM STAFF

A Kent man who announced Friday that he intended to carry a pistol into a West Seattle community center to trigger a lawsuit challenging Seattle's ban on guns in public spaces did just that Saturday, and was promptly asked to leave.

Bob Warden, 44, announced his intentions in an e-mail Friday morning to media as well as to the city of Seattle, including the police and city attorney.

On Saturday, Warden walked into the Southwest Community Center at 2801 SW Thistle Street with a Glock-27 .40-caliber sub-compact pistol under a black jacket in a holster strap over his left shoulder. Parks Department employee Lisa Harrison asked him to leave, and he did.

"I'm not here as a Second Amendment activist," Warden said. "I'm here as a citizen who believes in the rule of law."

Warden, who said he's never discharged a weapon outside a firing range, added that the idea occurred to him in the past couple of days.

Media, Seattle Police and a handful of supporters were on hand. Warden sent out an e-mail Friday announcing his intentions.

"As a courtesy, this is advance notice that at noon tomorrow, Saturday, November 14, I plan to exercise my legal right to bear arms in Seattle's Southwest Community Center, 2801 SW Thistle Street," Warden said in his e-mail. "I will be safely and securely carrying my holstered Glock pistol. I have a current valid State of Washington License to Carry Concealed."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bud Shasteen, 75, an NRA member member of the Second Amendment Foundation, was among Warden's supporters.

"I'm glad he is doing it," Shasteen said. "I'm sorry I didn't think of it. I'd have done it myself."

Alex Kaehler, 16, and his sister, Jeanmarie Kaehler, 20, were also on hand to support the move. Neither owns a weapon, but both said they want to.

"The mayor was definitely way out of line when he passed the law," said Alex Kaehler, who lives in SeaTac. "I'm glad somebody is challenging him."

Mayor Greg Nickels said the ban is intended to protect children. Warden objected to that reasoning.

"Nickels has never presented any evidence to suggest how responsible concealed-weapon carrying is a threat to children in a park," Warden said.

Nickels said on Oct. 14 that guns would be banned on such city facilities as parks and community centers where children gather. Signs banning guns have been posted at city parks.

Late last month, gun-rights advocates sued, saying the ban violates state law.

But Warden, a licensed attorney in the state, said Friday he worries that the earlier lawsuit may be thrown out because those who filed it lack legal standing.

Warden said he does not actively practice law. He said he works in labor relations for the federal government but would not describe his job further.

He said he is taking the action because he believes the ban is illegal. He noted that the state Attorney General's Office has said so.

"They know full well it's illegal, but they went ahead and did it anyway," Warden said Friday.

Warden described himself as a political independent, but a man who has probably voted for only two Republicans in his life.

He said he is not a member of the National Rifle Association, but was certified by that organization as a pistol instructor. He said he uses the certification in his volunteer work with the Boy Scouts.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

11/14/09 STLPI (No Page)                                                      Page 3

"I'm not some gun rights nut," he said Friday.

---- INDEX REFERENCES ---

COMPANY: MEDIA AG FUER INNOVATIVE MEDIENTECHNOLOGIE; KENT INDUSTRIAL CO LTD; @MEDIA; MEDIA SA

NEWS SUBJECT: (Gun Rights & Regulations (1GU97); Social Issues (1SO05))

REGION: (North America (1NO39); Washington (1WA44); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (AMENDMENT FOUNDATION; BOY SCOUTS; KENT; MEDIA; NATIONAL RIFLE ASSOCIATION; NRA; SOUTHWEST COMMUNITY CENTER) (Alex Kaehler; Bob Warden; Bud Shasteen; Greg Nickels; Jeanmarie Kaehler; Lisa Harrison; Nickels; Shasteen; Warden)

EDITION: Web Edition

Word Count: 659
11/14/09 STLPI (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

NewsRoom

11/14/09 NBC5KING-WA (No Page)

11/14/09 Seattle 5 KING-WA (Pg. Unavail. Online)
2009 WLNR 23028146

5 KING-WA

Copyright 2009 inewsnetwork Inc.

November 14, 2009

KING-5 5:30PM NEWS 2009-11-14 17:30:10

Seattle, WA

NBC

5 KING

KING-5 5:30PM NEWS

2009-11-14

17:30:10

IS SEATTLE'S GUN BAN LEGAL?

TODAY, ONE MAN DECIDED TO PROTEST THE CITY'S NEW POLICY, DECIDING TO CARRY A WEAPON INTO A BUILDING PACKED WITH CHILDREN. CHRIS DANIELS WAS THERE WHEN IT HAPPENED AND JOINS US NOW LIVE FROM WEST SEATTLE. CHRIS?

Reporter: ALAN, SEATTLE'S OUTGOING MAYOR GREG NICHOLS RECENTLY ISSUED THE EXECUTIVE ORDER TO BAN GUNS FROM SPECIFIC PLACES WHERE SMALL CHILDREN AND FAMILIES MAY GATHER, LIKE PARKS AND COMMUNITY CENTERS LIKE THE ONE HERE IN WEST SEATTLE. AND TODAY, IT IS WHERE ONE KENT MAN TRIED TO DEFY THE ORDER, HE SAYS, BY TRYING TO PROVE NICKELS IS NOT ABIDING BY THE LAW.

IT'S A CIVIL RIGHT, JUST LIKE ANY CIVIL RIGHT.

Reporter: BOB WARDEN ALERTED EVERYONE. HE WAS GOING TO TAKE HIS LEGAL CONCEALED AND HOLLISTERED GLOCK INTO THE SOUTHWEST COMMUNITY CENTER AT NOON.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

I THINK PUBLIC OFFICIALS WHO CHOOSE TO COMPLETELY GO AGAINST THE LAW SHOULD NOT BE ALLOWED TO GET AWAY WITH IT.

Reporter: WARDEN WAS PROTESTING THE RECENT EXECUTIVE ORDER BY SEATTLE MAYOR GREG NICOLL TO BAN THE POSSESSION OF FIREARMS AT DESIGNATED CITY FACILITIES AND PARKS WITH SIGNS LIKE THESE. IT WAS A REACTION TO THE SHOOTING AT SEATTLE'S OAK LIVE FESTIVAL LAST YEAR. THE STATE ATTORNEY GENERAL'S OFFICE SAYS IT DOESN'T BE-LIEVE THE CITY HAS THE LEGAL RIGHT TO MAKE SUCH AN ORDER.

SOME PEOPLE ARE GOING TO LOOK AT THIS AND LOOK AT IT AS IF THE CITY OF SEATTLE HAS PUT A BIG SUE ME SIGN ON IT.

Reporter: THE ONE-MAN PROTEST WAS OVER IN A MINUTE.

YOU WILL NOT BE ALLOWED IN THIS FACILITY.

OKAY.

ASK YOU TO PLEASE WALK OUT OF THE FACILITY AND PUT THE GUN AWAY.

Reporter: THE MEDIA CIRCUS MADE LITTLE SENSE TO SOME PARENTS.

HE'S T HIS RIGHT TO MAKE A LEGAL CHALLENGE, BUT I DO SUPPORT THE CITY'S DECISION TO HAVE THE BAN IN PLACE.

Reporter: WARDEN SAYS IT NOW LAYS THE GROUNDWORK TO CONTINUE TO FIGHT THE ISSUE.

I NOW HAVE LEGAL STANDING TO FILE A SUIT CHALLENGING THE RULE.

Reporter: AND THAT'S BECAUSE HE SAYS HE WAS PERSONALLY TURNED AWAY IN THIS CASE, WHICH IS DIFFERENT THAN THE PLAINTIFFS IN ANOTHER CASE THAT'S ALREADY BEEN FILED. A SPOKESPERSON FOR CURRENT MAYOR GREG NICHOLS TOLD ME TODAY, QUOTE, WE'RE AB-SOLUTELY PREPARED FOR ANY CHALLENGE, UNQUOTE. AS FAR AS THE AG'S OPINION, THAT SAME SPOKESPERSON FOR THE MAYOR, ALEX FRIAR, SAID AGAIN, QUOTING, IT'S JUST AN OPINION. WE HAVE A RIGHT AND WE'RE WILLING TO GO TO COURT TO PROVE IT, UNQUOTE. LIVE TONIGHT IN WEST SEATTLE, CHRIS DANIELS, KING 5 NEWS.

THE MAYOR'S ORDER STATES IF ANYBODY WITH A GUN REFUSES TO LEAVE A DESIGNATED

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ARREST, THEY CAN BE ARRESTED FOR CRIMINAL TRESPASS. TODAY, WARDEN LEFT. HE WAS NOT DETAINED.

---- INDEX REFERENCES ---

COMPANY: AG; MEDIA AG FUER INNOVATIVE MEDIENTECHNOLOGIE; FACILITY; @MEDIA; ME-DIA SA

NEWS SUBJECT: (Gun Rights & Regulations (1GU97); Social Issues (1SO05); Government (1GO80); Local Government (1LO75))

REGION: (North America (1NO39); Washington (1WA44); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (AG; FACILITY; FRIAR; GUN; JOINS; MEDIA; NBC; NICKELS; OPINION; PARKS; PLAINTIFFS; PROTEST; QUOTE; QUOTING; SPOKESPERSON; WARDEN) (CHRIS DANIELS; GREG; GREG NICHOLS; HOLLISTERED GLOCK; LEGAL CONCEALED; LIVE TONIGHT)

Word Count: 526
11/14/09 NBC5KING-WA (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

11/14/09 CBS7KIRO-WA (No Page)

11/14/09 Seattle 7 KIRO-WA (Pg. Unavail. Online)
2009 WLNR 23029788

7 KIRO-WA

Copyright 2009 inewsnetwork Inc.

November 14, 2009

KIRO-7 EYEWITNESS NEWS AT 11 2009-11-14 23:15:17

Seattle, WA

CBS

7 KIRO

KIRO-7 EYEWITNESS NEWS AT 11

2009-11-14

23:15:17

A MAN CARRIES A GUN INTO A COMMUNITY CENTER FULL OF FALLS AND SMALL CHILDREN. WITH POLICE AROUND, HE IS ASKED TO LEAVE AND HE IS NOW TALKING ABOUT TAKING HIS BEEF TO COURT.

IT'S NOT MY GOAL TO BE ARRESTED. IT'S NOT MY GOAL TO MAKE A SCENE OR ANYTHING.

BOB WARDEN IS ONE PERSON WHO DOESN'T WANT TO COMMIT AN ACT OF CIVIL DISOBEDI-ENCE ARMED. THIS MORNING HE PACKED UP HIS GUN AND SET OUT FOR THE SOUTHWEST COMMUNITY CENTER IN PROTEST OF SEATTLE'S BAN ON GUNS IN CITY PARKS. HE DOESN'T LIVE HERE ANYMORE. HE IS IN KENT NOW, BUT HE SAYS THIS IS A BIGGER ISSUE.

IF YOU ACCEPT THE IDEA THAT WE HAVE MEN AND WOMEN IN THE ARMED FORCES, OVER-SEAS, RIGHT NOW, IN SOME CASES, DYING FOR OUR LIBERTIES. IF YOU ACCEPT THAT, THEN HOW OFFENSIVE IS IT FOR PEOPLE TO WILLY NILLY LET THEM FLOAT AWAY AT 1:00?

SO HE WARNED THEM HE WOULD BE COMING AT NOON, A HIGH-NOON MEETING, IF YOU WILL IS. WITH CAMERAS SURROUNDING HIM, HE WALKED, BUT AS ANTICIPATED, HE DIDN'T GET

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FAR.

PLEASE GO OUT THE VICINITY.

Reporter: AND SO HE DID, GOING IN PEACE WITH HIS PIECE, BELIEVING HE SET THE SCENE FOR THE REAL SHOWDOWN IN COURT.

I AM HERE AS A CITIZEN, WHO BELIEVES IN THE RULE OF LAW.

NO WORD ON HE MAY FILE A LAWSUIT. WE GOT THIS RESPONSE FROM THE MAYOR'S OFFICE TODAY. "WE IS EXPECTED THERE WOULD BE LEGAL CHALLENGES AND WE LOOK FORWARD TO STATING OUR CASE IN COURT. WE REMAIN FIRM THAT GUNS HAVE NO PLACE IN COMMUNITY CENTERS,ED WITH AING POOLS AND OTHER PLACES WHERE KIDS ARE PRESENT."

---- INDEX REFERENCES ---

COMPANY: CENTENNIAL BRILLIANCE SCIENCE AND TECHNOLOGY CO LTD; BANK OF BEIJING CO LTD; BANK OF BARODA

REGION: (North America (1NO39); Washington (1WA44); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (ACCEPT; ANTICIPATED; BOB; CBS; COMMUNITY; COMMUNITY CENTER; DYING; GUNS; OFFENSIVE; POOLS) (CAMERAS SURROUNDING; LEGAL CHALLENGES)

Word Count: 305
11/14/09 CBS7KIRO-WA (No Page)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.