1  **Daniel J. Dunne, Jr.**
   WSBA No. 16999
2  ddunne@orrick.com
3  **George E. Greer**
   WSBA No. 11050
4  ggreer@orrick.com
   **David S. Keenan**
5  WSBA No. 41359
   dkeenan@orrick.com
6  **ORRICK HERRINGTON & SUTCLIFFE LLP**
7  701 Fifth Avenue Suite 5700
   Seattle, WA 98104-7097
8  Telephone:  (206)839-4300
   Facsimile:  (206)839-4301
9

10  **Gary Keese**
    WSBA No. 19265
11  gary.keese@seattle.gov
    **SEATTLE CITY ATTORNEY**
12  600 Fourth Avenue, 4th Floor
    P.O. Box 94769
13  Seattle, WA  98124-4769
    Telephone:  (206)684-8200
14  Facsimile:  (206)684-8284

15

16  *Attorneys for Gregory J. Nickels and City of Seattle*

17              UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
18                      AT SEATTLE

19
    ROBERT C. WARDEN,
20
                  Plaintiff,          Case No. 2:09-CV-01686-MJP
21
         v.
22
    GREGORY J. NICKELS and CITY OF    DECLARATION OF ERIC FRIEDLI
23  SEATTLE                           SUPPORT OF DEFENDANTS'
                                      OPPOSITION TO PLAINTIFF'S
24                                    MOTION FOR PRELIMINARY
                                      INJUNCTION
25

26

27

28

DECLARATION OF ERIC FRIEDLI

1

I, Eric Friedli, declare as follows:

1.      I am the manager of policy and business analysis with the City of Seattle's Parks and Recreation Department ("Parks Department"). I have personal knowledge of the matters set forth herein and, if called upon, I could and would competently testify thereto.

2.      Attached as Exhibit A to my declaration is a true and correct copy of Parks Department Policy P 060 – 8.14, which prohibits firearms as a condition of entry into or use of designated Parks Department facilities.

3.      The Parks Department receives nearly two million visitors each year. With respect to some of the specific children-oriented facilities for which we keep records, we estimate that in 2008, over 108,000 children and youth visited wading pools, and more than 59,000 youth events were scheduled at sports fields. We estimate that children and youth visited Parks Department playgrounds, play areas, and sports courts hundreds of thousands of times. Among the Parks Department facilities that are either largely or predominantly focused on providing recreational and educational opportunities for children are the following:

- Playgrounds and children's play areas
- Sports fields, sports courts and sports facilities
- Swimming and wading pools
- Spray park
- Teen centers
- Community centers
- Environmental learning centers
- Small craft centers
- Performing arts centers
- Tennis centers
- Skateboard parks
- Golf courses
- Swim beaches

4.      Pursuant to Policy P 060 – 8.14, the Parks Department has now posted signs at many of these types of facilities. Even with these postings of the Policy prohibiting guns in designated areas, most areas of the Parks Department's parks remain open to all users, including persons carrying weapons, as long as they are in lawful compliance with state and federal laws.

DECLARATION OF ERIC  FRIEDLI                    2

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5700
Seattle, Washington 98104-7097
tel+1-206-839-4300

2

5.    As the owner and operator of Parks Department facilities at which children and youth are likely to be present, the City has a strong interest in promoting facility users' and visitors' confidence, particularly families with children, that such facilities are safe and secure places to visit.

6.    The City has determined that carrying concealed firearms and displaying firearms at Parks Department facilities at which children and youth are likely to be present threatens the City's interests in promoting the use of those facilities by children, youth and their families. The safe and secure use of Parks Department facilities is disturbed by the threat of intentional or accidental discharges of firearms in the vicinity of children, which can result from various unforeseen circumstances, such as the escalation of disputes among individuals carrying firearms.

7.    In considering appropriate policies for the use of its Park facilities, the City considered publicly available information about firearm safety. In particular, the City considered a peer-reviewed study conducted in association with the University of Pennsylvania, in which researchers found that assault victims who possessed firearms at the time of an assault were at least 4.5 times more likely to be the victim of gun fire than assault victims who do not have a firearm. Branas et al, "Investigating the Link Between Gun Possession and Gun Assault," *American Journal of Public Health* 99(11)(2009). A true and correct copy of this study is attached as Exhibit B to my declaration.

8.    Based in part on this peer-reviewed research, it is rational for the City to find that the presence of guns does not enhance the safety of park users, particularly children and youths, but also persons who carry weapons on their person. The City also finds that the presence of weapons in Parks Department facilities can cause confrontations to escalate in violence, increasing the danger that the participants and/or children, youths and innocent bystanders may be injured or killed if guns are discharged to settle disputes at City facilities.

9.    State law prohibits people under the age of 21 from carrying concealed weapons. Obviously, children and youths do not have the option to carry firearms for their

DECLARATION OF ERIC FRIEDLI                    3                    Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5700
Seattle, Washington 98104-7097
tel+1-206-839-4300

self-protection. The City's Policy is intended, in part, to limit the risk to children and youths that they may be injured by guns carried by adults at City facilities.

10. As expressly stated in the City's Policy, it is City policy to rely on "law enforcement officers and on-duty security officers at Parks Department facilities" to protect public safety. Exhibit A at p. 4. Parks Department rangers and security personnel are trained to handle various situations that may arise in City facilities. Officers of the Seattle Police Department receive extensive criminal justice training including training about the handling of firearms and use of deadly force. Citizens who obtain Concealed Pistol Licenses ("CPL") are not required to have any training whatsoever, and are not subject to well-defined policies and supervision on the use of force. The City's Policy does not recognize or rely upon CPL holders as an adjunct to public safety.

11. Policy P 060 – 8.14 is intended to promote safety by reducing gun violence and injury from avoidable incidents, including thefts, accidents, and escalating confrontations. For example, gun owners who engage in sports activities, such as swimming in wading pools, beaches or swimming pools, or playing basketball or tennis, running, or enjoying playground equipment, may remove their guns and place them in purses, bags, backpacks, jackets, or other places on the ground or floor where they are not locked and secure, they are not in line of sight at all times, and they are not within immediate reach of the owner 100% of the time. These unsafe storage and handling situations make firearms susceptible to being stolen, mishandled, or accidentally discharged. For example, children and youth who see their parents, guardians or companions leave a loaded firearm in an unsafe location may be tempted to explore or play with the gun, if it is suddenly accessible to them. There are many circumstances in Parks Department facilities where persons who engage in recreational or athletic facilities may decide to remove or store their weapons in a manner that is insecure, and the City's Policy is intended to reduce the risk of these incidents.

12. There are various situations that can go wrong. A recent example is an adult attending a festival at Seattle Center who got into a heated dispute with strangers, and

DECLARATION OF ERIC FRIEDLI 4 
Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5700
Seattle, Washington 98104-7097
tel+1-206-839-4300

removing a concealed pistol for which he had a valid permit, injured three attendees with his
gun fire.  A confrontation that would otherwise have had limited consequences led to serious
injuries because one of the men was carrying a concealed pistol.  More recently, a guest at
Westlake Center adjacent to city-owned Westlake Park somehow dropped his concealed pistol
on the floor, causing it to discharge accidentally in a crowded shopping area.  The only injury
was to the gun owner who shot himself in his own leg, but the bullet could just as easily have
hit and killed an innocent bystander.

13.     If the court issues an injunction that requires the City to remove the signs it has
posted the City will incur significant costs.  The City has installed 116 signs advising users of
its no-guns policy at approximately 82 City-owned facilities.  I have estimated that the cost to
remove these signs, in terms of labor and materials to the City, would be approximately
$5,500.  If the injunction were eventually reversed, I estimate that it would cost the City about
the same amount to reinstall the signage, for a total cost to the City of $11,000.

14.     Additionally, if users of Parks Department facilities are injured or killed
through the discharge of deadly weapons, as the property owner, the City may be named as a
defendant in tort litigation seeking substantial damages.  At a minimum, these kinds of suits
subject the City to substantial litigation expense.

I declare under penalty of perjury under the laws of Washington that the foregoing is
true and correct.  Executed this 19th day of January, 2010, in Seattle, Washington.

_____
Eric Friedli

DECLARATION OF ERIC FRIEDLI               5

Orrick Herrington & Sutcliffe LLP
701 5th Avenue, Suite 5700
Seattle, Washington  98104-7097
tel+1-206-839-4300

# CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2010, I electronically filed the following document

with the Clerk of the Court using the CM/ECF system which will send notification of the filing

to all counsel of record:  DECLARATION OF ERIC FRIEDLI IN SUPPORT OF

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY

INJUNCTION.

DATED this 19th day of January, 2010.


ORRICK, HERRINGTON & SUTCLIFFE LLP


By_s/ Daniel J. Dunne
      Daniel J. Dunne (WSBA #16999)

      701 Fifth Avenue, Suite 5700
      Seattle, WA  98104
      Phone: (206) 839-4300
      Fax:    (206) 839-4301
      Email: ddunne@orrick.com

DECLARATION OF ERIC FRIEDLI        6        Orrick Herrington & Sutcliffe LLP
CASE NO. 2:09-CV-01686-MJP        701 Fifth Avenue Suite 5700
       Seattle, Washington  98104-7097
       (206)839-4300

# EXHIBIT A

Your City  Seattle



# Department  Of  Parks  and  Recreation
# Rule/Policy

| Subject: Firearms May Be Prohibited as a Condition of Entry Into or Use of Designated Parks Department Facilities at Which Children and Youth are Likely to be Present | Number: P 060 - 8.14 |
|---|---|
| | Effective: October 14, 2009 |
| | |

| Approved: [signature] | Department:<br>**Parks & Recreation** | |
|---|---|---|

## 1.0 INTRODUCTION AND FINDINGS

1.1  The City owns and operates various City real property and facilities, including property and facilities under the jurisdiction of the Seattle Parks and Recreation Department ("Parks" or "Department").

1.2  In 2008 over 1.8 million people visited and attended programs in Parks Department owned community centers, pools, teen centers and environmental learning centers; over 108,000 children and youth visited wading pools; over 59,000 youth events were scheduled at sports fields; and, countless numbers of children and youth visited playgrounds, play areas, and sports courts.

1.3  As the owner and operator of Department facilities at which children and youth are likely to be present, the City has a strong interest in promoting facility users' and visitors' confidence, particularly families with children, that such facilities are safe and secure places to visit.

1.4  Carrying concealed firearms and displaying firearms at Department facilities at which children and youth are likely to be present threatens the City's interests in promoting the use of those facilities by children, youth and their families.

1.5.  Based on the relatively small percentage of Seattle residents who have concealed weapons permits, we conclude that the vast majority of users of Department facilities where children and youth are present are families who do not carry firearms.

1.6  Such families' safe and secure use of Department facilities is disturbed by the threat of intentional or accidental discharges of firearms in the vicinity of children, which can result from various unforeseen circumstances, (such as the escalation of disputes among individuals carrying firearms; the accidental discharge of firearms in the vicinity of children; the mishandling of firearms; the unsafe temporary storage or placement of

8

firearms that may be found and accidentally discharged by children and youths; and the intimidation that occurs when someone openly displays firearms in the presence of youth and children.

1.7 Children are frightened and threatened by the presence of firearms in facilities designed for their safe use and enjoyment;

1.8 Many injuries to children by firearms occur when children are playing and gain access to firearms they find that are otherwise legally possessed, and there is an increased potential for accidental injuries and deaths from such instances if adults leave their firearms unattended or improperly stored in purses, bags, or other concealed places while they play with their children on park equipment and facilities.

1.9 Parks are gathering places for groups of youth and young adults ages 18 to 25 for a range of activities where fights sometimes occur, and the presence of even otherwise lawfully-possessed firearms increases the likelihood of gun violence to resolve disputes that would not otherwise involve a threat to life or grievous bodily harm.

1.10. Studies demonstrate that individuals possessing firearms are more likely to be shot in an assault than those who do not have a firearm. For example, a recent study conducted by University of Pennsylvania researchers conclude that armed individuals were four and one-half (4.5) times more likely to be shot. It is reasonable for the Department to conclude that more firearms in Parks facilities increases the likelihood that someone will be seriously injured.

1.11. Many parents will not permit their children to play in public spaces where firearms are permitted, depriving some children of the ability to peacefully use city facilities intended for their benefit.

1.12. The City's and Department's interests will be promoted by establishing a policy that the Superintendent may, by erecting appropriate signage at a facility at which children and youth are likely to be present, communicate to the public that firearms are not permitted at that facility as a condition of entry to or use of the facility.

## 2.0 REFERENCES AND AUTHORITY

2.1 This policy/rule is authorized by and promulgated as provided in the City's Administrative Code (SMC Chapter 3.02), in SMC 3.26.040.L (Parks Superintendent's Rule-Making Authority); and in SMC 18.12.040 (Superintendent's authority -- Rulemaking –Enforcement).

2.2 The City earlier proposed a rule regarding firearms on City property. The City and Department conducted a written comment period and held a hearing for the receipt of oral comments. The City decided to narrow the proposal so that it applied only to Parks Department facilities at which children and youth are likely to be present. The Parks Department conducted another comment period and received approximately 1,000

9

additional written comments. The Superintendent therefore finds that conducting another public hearing to receive additional oral comments on the modified proposal is not necessary.

## 3.0 DEFINITIONS

**3.1** "**City**" means the City of Seattle.

**3.2** "**Parks Department facilities**" means City owned or operated buildings and improvements operated under the jurisdiction of the Department of Parks and Recreation.

**3.3** "**Department**" means the Seattle Department of Parks and Recreation ("Parks').

**3.4** "**Designated Parks Facility**" means the facilities listed in Section 5 as Department facilities where children and youth are likely to be present.

**3.5** "**Displaying a firearm**" means to carry a firearm in such a manner that the firearm is visible to others,.

**3.6** "**Firearm**" means a weapon or device from which a projectile may be fired by an explosive such as gunpowder.

**3.7** "**Firearms are not permitted**" means that the carrying of a concealed firearm and the display of a firearm are not permitted as a condition of entry or use of the particular facility.

**3.8** "**Law enforcement officer**" means: 1) a sworn Seattle Police officer, or 2) qualified law enforcement officer as defined in 18 U.S.C.A § 926B(c), or a qualified retired law enforcement officer as defined in 18 U.S.C.A. § 926C(c), who is carrying a firearm permitted under 18 U.S.C.A § 926 and is carrying identification as required by that section.

**3.9** "**On Duty Security Officer**" means an individual other than a law enforcement officer who: is employed for the purpose of providing security; is required to carry a firearm as a condition of that employment; is providing security services at the time on City property; and has legal authority to carry the firearm at the time.

**3. 10 Carrying a concealed firearm** " means to carry a firearm in such a manner that it is not visible to others. Carrying a concealed firearm does not include storing a firearm lawfully in a vehicle that is located on City property. Carrying a concealed firearm also does not include carrying a lawful firearm onto City property for the purpose of promptly determining: 1) if the facility is designated as one at which firearms are not permitted ; or 2) if the facility has an area designated for the safe storage of firearms.

**3.11** "**RCW**" means the Revised Code of Washington.

3.12 "SMC" means Seattle Municipal Code.

3.13 "Appropriate signage" means signs that indicate to the public that firearms are not permitted as a condition of entry to or use of a particular facility at which children and youth are likely to be present.

3.14 "Superintendent" means the Superintendent of Parks and Recreation, or his or her authorized designee.

## 4.0 GENERAL POLICY: CARRYING CONCEALED FIREARMS AND DISPLAYING FIREARMS ARE NOT PERMITTED AT PARKS DEPARTMENT FACILITIES AT WHICH CHILDREN AND YOUTH ARE LIKELY TO BE PRESENT

The Department, in its proprietary capacity as owner or manager of Department facilities, does not permit the carrying of concealed firearms or the display of firearms, except by law enforcement officers and on-duty security officers, at Parks Department facilities at which: 1) children and youth are likely to be present and, 2) appropriate signage has been posted to communicate to the public that firearms are not permitted at the facility. .

## 5.0 DESIGNATED PARKS DEPARTMENT FACILITIES AT WHICH CHILDREN AND YOUTH ARE LIKELY TO BE PRESENT

**5.1 Facilities at which children and youth are likely to be present.** The following Department facilities are designated as facilities where children and youth are likely to be present:

5.1.1 Playgrounds and Children's play areas;
5.1.2 Sports Fields, Sports Courts and other sports facilities;
5.1.3 Swimming and Wading Pools;
5.1.4 Spray Parks (Water Play Areas);
5.1.5 Teen Centers;
5.1.6 Community Centers;
5.1.7 Environmental Learning Centers;
5.1.8 Small craft centers;
5.1.9 Performing Arts Centers;
5.1.10 Tennis Centers;
5.1.11 Skateboard Parks;
5.1.12 Golf Courses; and,
5.1.13 Swim beaches.

**5.2 Posting.** The Superintendent may post at a Parks facility at which children and youth are likely to be present appropriate signage indicating to the public that firearms are not permitted at that facility.

## 6.0 WITHDRAWAL OF PERMISSION TO REMAIN AT A PARTICULAR DESINGATED FACLILTY

**6.1. No Criminal or Civil Penalties.** This policy/rule does not include any criminal or civil penalties. Rather, it constitutes conditions placed upon a person's permission to enter or remain at a designated Parks Department facility at which appropriate signage has been posted. Such conditions shall be enforced in the same manner and pursuant to the same ordinances and statutes as similar conditions could be enforced by other public or private property owners.

**6.2 Withdrawal of Permission to Enter or Remain at the Designated Facility.** The following individuals have authority to withdraw in writing or orally a person's permission to enter or remain at a designated Parks Department facility:

**6.2.1** Sworn Seattle police officers; and,

**6.2.2** Other City employees or agents delegated such authority by the Superintendent.

## 7.0 GUIDELINES

The Superintendent may issue operating guidelines, procedures, or protocols that, among other things, inform City employees and other authorized persons how to properly implement this policy. Such protocols should include procedures regarding enforcement and, where practicable, the possible safe storage of firearms at designated City facilities.

# EXHIBIT B

# Investigating the Link Between Gun Possession and Gun Assault

Charles C. Branas, PhD, Therese S. Richmond, PhD, CRNP, Dennis P. Culhane, PhD, Thomas R. Ten Have, PhD, MPH, and Douglas J. Wiebe, PhD

Among a long list of issues facing the American public, guns are third only to gay marriage and abortion in terms of people who report that they are "not willing to listen to the other side." In concert with this cultural rift, scholarly discussion over guns has been similarly contentious.[1] Although scholars and the public agree that the roughly 100 000 shootings each year in the United States are a clear threat to health, uncertainty remains as to whether civilians armed with guns are, on average, protecting or endangering themselves from such shootings.[2–4]

Several case–control studies have explored the relationship between homicide and having a gun in the home,[5,6] purchasing a gun,[7,8] or owning a gun.[9] These prior studies were not designed to determine the risk or protection that possession of a gun might create for an individual at the time of a shooting and have only considered fatal outcomes. This led a recent National Research Council committee to conclude that, although the observed associations in these case–control studies may be of interest, they do little to reveal the impact of guns on homicide or the utility of guns for self-defense.[3,10]

However, the recent National Research Council committee also concluded that additional individual-level studies of the association between gun ownership and violence were the most important priority for the future.[3] With this in mind, we conducted a population-based case–control study in Philadelphia to investigate the relationship between being injured with a gun in an assault and an individual's possession of a gun at the time. We included both fatal and nonfatal outcomes and accounted for a variety of individual and situational confounders also measured at the time of assault.

## METHODS

We applied a case–control study design to determine the association between being injured with a gun in an assault and an individual's possession of a gun at the time. To determine this in the most generalizable way, we chose our target population to be residents

*Objectives.* We investigated the possible relationship between being shot in an assault and possession of a gun at the time.

*Methods.* We enrolled 677 case participants that had been shot in an assault and 684 population-based control participants within Philadelphia from 2003 to 2006. We adjusted odds ratios for confounding variables.

*Results.* After adjustment, individuals in possession of a gun were 4.46 ($P<.05$) times more likely to be shot in an assault than those not in possession. Among gun assaults where the victim had at least some chance to resist, this adjusted odds ratio increased to 5.45 ($P<.05$).

*Conclusions.* On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses occur each year, the probability of success may be low for civilian gun users in urban areas. Such users should reconsider their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. (*Am J Public Health.* 2009;99:XXX–XXX. doi:10.2105/AJPH.2008.143099)

of Philadelphia, Pennsylvania, prompting the use of population-based control participants. We considered trial, cohort, and matched cohort designs but for various reasons (ethical considerations, prohibitively long implementation time, limited generalizability, and so on.) these were not pursued.

We assumed that the resident population of Philadelphia risked being shot in an assault at any location and at any time of day or night. This is an acceptable assumption because guns are mobile, potentially concealable items and the bullets they fire can pass through obstacles and travel long distances.[11–14] Any member of the general population has the potential to be exposed to guns and the bullets they discharge regardless of where they are or what they are doing. As such, we reasonably chose not to exclude participants as immune from hypothetically becoming cases because they were, for instance, asleep at home during the night or at work in an office building during the day. Instead we measured and controlled for time-based situational characteristics that might have changed, but did not eliminate, the possibility of being shot in an assault.

### Participant Identification and Matching

Gunshot assault cases caused by powder charge firearms were identified as they occurred, from October 15, 2003, to April 16,

2006. The final 6 months of this period were limited to only fatal cases. We excluded self-inflicted, unintentional, and police-related shootings (an officer shooting someone or being shot), and gun injuries of undetermined intent. We excluded individuals younger than 21 years because it was not legal for them to possess a firearm in Philadelphia and, as such, the relationship we sought to investigate was functionally different enough to prompt separate study of this age group. We excluded individuals who were not residents of Philadelphia as they were outside our target population and individuals not described as Black or White as they were a very small percentage of shootings (<2%). Even after these exclusions, the study only needed a subset of the remaining shootings to test its hypotheses. A random number was thus assigned to these remaining shootings, as they presented, to enroll a representative one third of them.

Data coordinators at the Philadelphia Police Department identified and enrolled new shooting case participants as they occurred by reviewing an electronic incident tracking system and interviewing police officers, detectives, and medical examiners. Basic data for eligible case participants were wirelessly sent to the University of Pennsylvania where study leaders forwarded them to a survey research firm for recruitment of a matched control participant.

More detailed information for each enrolled case was later filled in with additional data from state and local police, medical examiner, emergency medical services, and hospital data sources.[15]

We pair-matched case participants to control participants on the date and time (within 30-minute intervals; i.e., 10:30 pm, 11:00 pm) of each shooting. This was done because the factors we planned to analyze, including gun possession, were often short-lived making the time of the shooting most etiologically relevant.[16] This also helped to control for a great many unmeasurable confounders related to time. We also matched our control participants to case participants on the basis of age group (aged 21–24 years, 25–39 years, 40–64 years, and 65 years and older), gender, and race (Black or White). We pair-matched on these variables to avoid extremely sparse data in certain subgroups given a priori knowledge that exceedingly different age, race, and gender distributions existed among assaultive shootings relative to the general population of Philadelphia.[17] We did not pair-match case participants and control participants on location. On the basis of early power calculations, we matched 1 control participant to each shooting case.

Control participants were in Philadelphia at the time their matched case was shot. The median number of days between the time a shooting occurred and the time a control participant interview was completed was 2 days. More than three quarters of all control participant interviews were completed within 4 days of their matched shooting. Control participants were interviewed as rapidly as possible to minimize recall bias.

Control participants were sampled from all of Philadelphia via random-digit dialing.[10,18] In the interest of time, multiple interviewers may have simultaneously begun and then completed control participant interviews. This resulted in 7 case participants that had more than 1 control participant. These few additional control participants were retained in final analyses. We also tested for the possibility of unequal sampling by using an inverse probability of selection weight defined as the number of eligible control participants divided by the number of phone lines in a household. These weighted models generated only very small differences (<5%) in our results.

We took several steps to maximize participation and avoid selection biases caused by nonresponse.[15,10,19–21] According to standard formulae, the cooperation rate for our control participant survey was calculated to be 74.4% and the response rate 56.0%.[22] These rates exceeded those of other surveys conducted at about the same time[23] and were high enough to produce a reasonably representative sample of our target population.[24,25] Our control participants were statistically similar to the general population of Philadelphia in terms of marital status, retirement, education, general health status, and smoking status within the age, gender, and race categories specified earlier.[26] Our control participants were, however, significantly more unemployed than the general population.

### Conceptual Framework and Variables

We conceptually separated confounding variables in the association between victim gun possession and gun assault into individual and situational characteristics, both of which feed the eventual victim–offender interaction that results in gun assault (Figure 1).[27–29]

Case subsets included fatal gun assaults and gun assaults in which the victim had at least some chance to resist the threat posed by an offender, based on circumstance data and written accounts from police, paramedics, and medical examiners. Case participants with at least some chance to resist were typically either 2-sided, mutual combat situations precipitated by a prior argument or 1-sided attacks where a victim was face-to-face with an offender who had targeted him or her for money, drugs, or property. Case participants with at least some chance to resist were in contrast to those that happened very suddenly, involved substantial distances, had no face-to-face contact, and

had physical barriers between victim and shooter (e.g., an otherwise uninvolved victim shot in his living room from a gun fired during a fight down the street).[30–33] Each case's chance-to-resist status was assigned after being independently rated by 2 individuals (initial $\kappa=0.64$ indicating substantial agreement[34]) who then reconciled differential ratings.

For case participants, gun possession at the time of the shooting was determined by police observations at crime scenes and police interviews with victims and witnesses, as well as confiscation and recovery of guns by police investigators. We coded case participants as in possession if 1 or more guns were determined to have been with them and readily available at the time of the shooting. We coded control participants as in possession if they reported any guns in a holster they were wearing, in a pocket or waistband, in a nearby vehicle, or in another place, quickly available and ready to fire at the time of their matched case's shooting. We determined gun possession status for 96.8% of case participants and 99.6% of control participants. We imputed missing data by using multiple imputation by chained equations.[35,36]

We collected participants' locations as street intersection or blockface points. We collected environmental factors as centroid and population-weighted centroid points of blocks, block groups, and tracts.[37] We assigned study participants cumulative, inverse distance-weighted measures of each environmental factor on the basis of the points where they were located and the point locations and magnitudes of the factors surrounding them. The higher the measure, the greater the clustering and magnitude of factors around a participant's location.[15,38]



**FIGURE 1—Conceptual framework showing the relationships between victim gun possession, gun assault, and other important characteristics.**

2 | Research and Practice | Peer Reviewed | Branas et al.     American Journal of Public Health | November 2009, Vol 99, No. 11

15

## Statistical Analyses

We modeled gun possession as the focal independent variable with the outcome of gun assault and other confounding variables by using conditional logistic regression.[39] We excluded excessively collinear confounders to keep variance inflation factors less than 10.[40]

We adjusted all regression models for yearly age (to control for residual variability within age groups that remained after matching[17]) and numerous other potential individual and situational confounders based on previous work and theory (Table 1).[5–8,27,32,33,41–48] We defined workers at high probability of being assaulted based on their profession (e.g., their job involved handling of cash) as being at high risk.[46] We

calculated reduced regression models with confounders that, when added to the model of gun possession and yearly age, changed the matched odds ratio by more than 15%.[49,50] We also calculated full regression models with all confounders that were not excessively collinear regardless of how much they changed the matched odds ratio. Robust sandwich estimators of variance were specified.[51] Regression model residuals were not statistically significant for spatial autocorrelation.[52,53]

We performed sensitivity analyses to assess the potential impact of misclassification bias on our analyses of gun possession and gun assault. To do this we purposely miscoded the gun possession status of case participants and

control participants by specifying that a randomly selected 1%, 3%, 5%, and 10% of them had their guns go undetected and then reran our regression models to determine the effect on our original odds ratio. We repeated this procedure 100 times for each percentage combination of miscoded case participants and control participants and averaged the results to produce a mean biased odds ratio and standard error. The 2 misclassification biases upon which we most concentrated were case participants without guns recoded to having guns (e.g., to test the bias of a shooting victim or others on-scene disposing of their guns before police arrived) and control participants without guns recoded to having guns (e.g., to

TABLE 1—Comparison of Case and Control Participants, by Situational and Individual Characteristics: Philadelphia, PA, 2003–2006

| | All Gun Assaults | | Fatal Gun Assaults | | Gun Assaults Where Victim Had at Least Some Chance to Resist | |
|---|---|---|---|---|---|---|
| | Case Participants (n = 677) | Control Participants (n = 684) | Case Participants (n = 163) | Control Participants (n = 166) | Case Participants (n = 446) | Control Participants (n = 451) |
| **Situational characteristics** | | | | | | |
| Gun possession, % | 5.92 | 7.16 | 8.80 | 7.85 | 8.28 | 7.37 |
| Alcohol involvement, % | 26.34 | 13.82** | 24.55 | 14.20** | 28.94 | 13.58** |
| Illicit drug involvement, % | 11.27 | 7.51** | 23.38 | 4.75** | 9.00 | 8.85 |
| Being outdoors, % | 83.13 | 9.05** | 70.77 | 9.24** | 82.21 | 9.65** |
| Others present, mean no. of people | 3.12 | 2.91 | 3.29 | 2.90 | 3.36 | 2.95 |
| Surrounding area | | | | | | |
| Blacks, mean 1000 people per mile | 26.04 | 20.19** | 24.44 | 20.62** | 25.81 | 19.56** |
| Hispanics, mean 1000 people per mile | 4.50 | 2.68** | 4.21 | 2.89* | 4.65 | 2.68** |
| Unemployment, mean 1000 people per mile | 2.44 | 1.98** | 2.29 | 2.02** | 2.43 | 1.96** |
| Income, mean million dollars per mile | 594.90 | 652.79** | 577.11 | 632.32 | 586.65 | 660.26** |
| Alcohol outlets, mean number per mile | 79.87 | 82.12 | 73.05 | 82.42 | 78.48 | 84.28 |
| Illicit drug trafficking, mean arrests per mile | 953.21 | 563.60** | 809.94 | 634.19* | 958.58 | 551.69** |
| **Individual characteristics** | | | | | | |
| Age, mean, y | 30.56 | 32.65** | 31.99 | 34.12** | 30.88 | 32.84** |
| Black, % | 87.89 | 87.87 | 87.69 | 87.31 | 85.56 | 85.31 |
| Male, % | 91.88 | 91.67 | 91.38 | 91.54 | 94.40 | 94.25 |
| Hispanic, % | 7.15 | 3.51** | 7.63 | 4.23 | 8.12 | 3.82** |
| Occupation | | | | | | |
| Professional, % | 33.00 | 29.93 | 28.68 | 30.82 | 34.70 | 30.43 |
| Working class, % | 31.34 | 46.70 | 30.77 | 41.39 | 30.49 | 46.40 |
| Not working, % | 35.66 | 23.38 | 40.55 | 27.79 | 34.81 | 23.17 |
| High-risk occupation,[a] % | 24.34 | 11.40** | 13.78 | 10.45 | 27.21 | 10.99** |
| Education, mean, y | 11.59 | 12.73** | 11.66 | 12.68** | 11.59 | 12.76** |
| Prior arrests, % | 53.12 | 37.06** | 54.58 | 35.95** | 52.80 | 37.17** |

[Q1] [a]High-risk occupations were those in which workers had a high probability of being assaulted (e.g., their job involved handling of cash).[46]
*P ≤ .05; **P ≤ .01.

test the bias of having been in possession of a gun but not admitting it to an interviewer). The levels of misclassification we tested were based on prior work[54–56] and our own data that indicated less than 1% of our control participants were not "very sure" of their gun possession status. Statistical tests were 2-tailed and significance was indicated by $P$ values less than .05 throughout our analyses.

## RESULTS

Over the study period, our research team was notified of 3485 shootings of all types occurring in Philadelphia. This translated into an average of 4.77 (standard deviation [SD]=2.82) shootings per day, with a maximum of 21 shootings in a single day and an average of 9 days a year that were free from shootings. From among all these shootings, 3202 (91.88%) were assaults, 167 were self-inflicted (4.79%), 60 were unintentional (1.72%), 54 were legal interventions (1.55%), and 2 were of undetermined intent (0.06%). When we considered only assaults, an average of 4.39 (SD=2.70) individuals were shot per day in Philadelphia with a maximum of 20 in a single day and an average of 13 days a year in which no individuals were shot.

From among all 3202 individuals who had been shot in an assault, we excluded those aged younger than 21 years or of unknown age (29.83%), non-Philadelphia residents (4.34%), individuals not described as being Black or White (1.62%), and police officers that had been shot (0.09%). From the remaining group of 2073 participants, we randomly selected and enrolled 677 individuals (32.66%). We also concurrently identified and enrolled an age-, race-, and gender-matched group of 684 control participants.

Case participants and control participants showed no statistically significant differences in age group, race, and gender distributions, or in the times of day, days of the week, and months of the year when their data were collected. Case participants and control participants were thus successfully matched on age category, race, gender, and time.

However, compared with control participants, shooting case participants were significantly more often Hispanic, more frequently working in high-risk occupations[1,2], less educated, and

had a greater frequency of prior arrest. At the time of shooting, case participants were also significantly more often involved with alcohol and drugs, outdoors, and closer to areas where more Blacks, Hispanics, and unemployed individuals resided. Case participants were also more likely to be located in areas with less income and more illicit drug trafficking (Table 1).

### Association Between Gun Possession and Gun Assault

After we adjusted for confounding factors, individuals who were in possession of a gun were 4.46 (95% confidence interval [CI]=1.16, 17.04) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 4.23 (95% CI=1.19, 15.13) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 5.45 (95% CI=1.01, 29.92) times more likely to be shot.

When we only considered independent variables that most strongly affected our models, smaller but correspondingly significant adjusted odds ratios were noted. In these reduced models, individuals who were in possession of a gun were 2.55 (95% CI=1.00, 6.58) times more likely to be shot in an assault than those not in possession. Individuals who were in possession of a gun were also 3.54 (95% CI=1.18, 10.58) times more likely to be fatally shot in an assault. In assaults where the victim had at least some chance to resist, individuals who were in possession of a gun were 2.92 (95% CI=1.01, 8.42) times more likely to be shot (Table 2).

Sensitivity analyses produced no odds ratio estimates less than 1.00. If we assumed that both case participants and control participants had 5% of their guns go undetected, the observed odds ratio of 4.46 (significant) would have been reduced to 2.23 (nonsignificant). Similarly, among gun assaults where the victim had a reasonable chance to resist, 5% underdetection of guns among both case participants and control participants would have reduced the observed odds ratio of 5.45 (significant) to 3.12 (nonsignificant; Table 3).

## DISCUSSION

After we adjusted for numerous confounding factors, gun possession by urban adults was associated with a significantly increased risk of being shot in an assault. On average, guns did not seem to protect those who possessed them from being shot in an assault. Although successful defensive gun uses can and do occur,[33,57] the findings of this study do not support the perception that such successes are likely.

A few plausible mechanisms can be posited by which possession of a gun increases an individual's risk of gun assault. A gun may falsely empower its possessor to overreact, instigating and losing otherwise tractable conflicts with similarly armed persons. Along the same lines, individuals who are in possession of a gun may increase their risk of gun assault by entering dangerous environments that they would have normally avoided.[58–60] Alternatively, an individual may bring a gun to an otherwise gun-free conflict only to have that gun wrested away and turned on them.

**TABLE 2—Regression Results Showing the Association Between Gun Possession and Gun Assault: Philadelphia, PA, 2003–2006**

|  | Total Participants (Cases and Controls), No. | Full Models, AOR (95% CI) | Reduced Models, AOR (95% CI) |
|---|---|---|---|
| All gun assaults | 1361 | 4.46 (1.16, 17.04)* | 2.55 (1.00, 6.58)* |
| Fatal gun assaults | 329 | 4.23 (1.19, 15.13)* | 3.54 (1.18, 10.58)* |
| Gun assaults where victim had at least some chance to resist | 897 | 5.45 (1.01, 29.92)* | 2.92 (1.01, 8.42)* |

*Notes.* AOR = adjusted odds ratio; CI = confidence interval. The full models adjusted for all characteristics listed in Table 1; reduced models adjusted for age, illicit drug involvement, being outdoors, and unemployment.
*$P \leq .05$.

17

**TABLE 3—Sensitivity Analyses Showing the Effects of Simulated Misclassification Because of Undetected Gun Possession: Philadelphia, PA, 2003–2006**

| % of Control Participants Without Guns Randomly Recoded to Having Guns[a] | % of Case Participants Without Guns Randomly Recoded to Having Guns[b] | | | | |
|---|---|---|---|---|---|
| | 0% | 1% | 3% | 5% | 10% |
| All gun assaults | | | | | |
| 0% | 4.46* | 4.80* | 5.45* | 6.22* | 8.25** |
| 1% | 3.66 | 3.83 | 4.51* | 5.07* | 6.91** |
| 3% | 2.49 | 2.69 | 3.11 | 3.51 | 4.81* |
| 5% | 1.86 | 2.01 | 2.37 | 2.23 | 3.07* |
| 10% | 1.03 | 1.14 | 1.32 | 1.26 | 1.78 |
| Fatal gun assaults | | | | | |
| 0% | 4.23* | 4.76* | 5.48* | 6.30* | 8.36** |
| 1% | 3.62 | 3.87* | 4.44* | 5.28* | 7.21* |
| 3% | 2.52 | 2.85 | 3.35 | 3.84 | 4.45* |
| 5% | 1.89 | 2.29 | 2.54 | 2.87 | 4.01 |
| 10% | 1.03 | 1.31 | 1.53 | 1.74 | 2.31 |
| Gun assaults where victim had at least some chance to resist | | | | | |
| 0% | 5.45* | 4.78* | 5.66* | 6.27* | 8.34 ** |
| 1% | 3.59 | 4.75 | 5.48 | 6.24* | 8.73* |
| 3% | 2.46 | 3.25 | 3.82 | 4.34 | 6.00* |
| 5% | 1.86 | 2.53 | 2.80 | 3.12 | 4.36 |
| 10% | 1.03 | 1.42 | 1.66 | 1.83 | 2.48 |

[a]For instance, to compensate for control participants who failed to disclose their gun possession.
[b]For instance, to compensate for case participants who discarded their guns after they were shot.
*$P \leq .05$; **$P \leq .01$; base adjusted odds ratio is adjusted odds ratios from full models with 0% of case and 0% of control participants recoded.

Situations in which the victim had at least some chance to resist may have generated gun assault risks when one considers that many of these events were 2-sided situations in which both parties were ready and mutually willing to fight on the basis of a prior argument.[29,30] Because both victim and offender had some sense of each other's capabilities prior to the event they may have had more time to prepare for their ensuing conflict.[61] More preparation may have increased the likelihood that both individuals were armed with guns and that at least 1 or both were shot.

Although less prevalent, 1-sided situations in which a victim had at least some chance to resist an unprovoked attack may have also generated gun assault risks for victims who possessed guns.[29] In these situations, victim and offender were often interacting for the first time and the element of surprise afforded the offender likely limited the victim's ability to quickly produce a gun and defuse or dominate their advantaged opponent. If the victim did produce a gun, doing so may have simply exacerbated an already volatile situation and gotten them shot in the process.

In contrast, when victims had little to no chance to resist, they were almost always confronted with events that happened very suddenly, involved substantial distances, had no face-to-face contact, and had physical barriers between them and the shooter (e.g., bystander or drive-by shootings). These victims likely had no meaningful opportunity to use a gun if they had one in their possession.

## Prior Case–Control Studies

We endeavored to improve upon prior case–control studies that have explored the relationship between homicide and exposure to guns.[5–9] Although gun homicides are important to prevent, the ability to produce a more general conclusion about the risk of gun assault, not simply the risk of being murdered with a gun,

was of greater importance to public health and safety. This prompted us to enroll all shootings, regardless of their survival, as one improvement to our case–control study.

A second improvement was our use of an incidence density sampling framework to select control participants. This allowed us to make a judgment about the risk associated with gun possession proximal to the shooting event itself. Prior case–control work has involved less proximal gun exposure measures — owning,[9] purchasing,[7,8] or having a gun in the home.[5,6] These measures leave open to question the actual risk that a gun may pose for an individual concurrent with the time they were shot. That is, someone may have a gun in their home, may have purchased a gun, or may own a gun, but without knowledge of whether that gun was in their possession at the time they were shot, the possibility that they have been misclassified as being exposed to a gun when in fact they were not is a potential bias.[43,62,63] This bias erodes the ability to speculate on plausible causal mechanisms other than to say that general access to a gun, over some amount of space or time, is a risk factor.

Finally, as this was a case–control study, we had the advantage of being able to statistically adjust for numerous confounders of the relationship between gun possession and gun assault. These confounders included important individual-level factors that did not change with time such as having a high-risk occupation, limited education, or an arrest record. Other confounders that we included were situational factors that could have influenced the relationship under study—substance abuse, being outside, having others present, and being in neighborhood surroundings that were impoverished or busy with illicit drug trafficking. Although these situational confounders were potentially short-lived (e.g., a participant may have metabolized the drugs or alcohol they consumed, moved to another location, or left the company of others) this was less important given the incidence–density sampling and the fact that case and control participants were essentially matched on time.

## Study Limitations

A number of study limitations deserve discussion. Our control population was more unemployed than the target population of

Philadelphians that it was to intended to represent. Although we did account for employment status in our regression models and our control population was found to be representative of Philadelphians for 5 other indicators, having a preponderance of unemployment among our control participants may mildly erode our study's generalizability. It is also worth noting that our findings are possibly not generalizable to nonurban areas whose gun injury risks can be significantly different than those of urban centers like Philadelphia.[64]

Certain other variables that may have confounded the association between gun possession and assault were also beyond the scope of our data collection system and, therefore, were not included in our analyses. For instance, any prior or regular training with guns was a potentially important confounding variable that we did not measure and whose inclusion could have affected our findings (although the inclusion of other confounding variables possibly related to training may account for some of this unmeasured confounding).

We also did not account for the potential of reverse causation between gun possession and gun assault. Although our long list of confounders may have served to reduce some of the problems posed by reverse causation,[65] future case–control studies of guns and assault should consider instrumental variables techniques to explore the effects of reverse causation. It is worth noting, however, that the probability of success with these techniques is low.[66]

Finally, our results could have been affected by misclassification of gun possession status. Because of prior discussion[63] and likely levels of misclassification,[54–56] we concentrated on undetected gun possession. The ensuing sensitivity analyses demonstrated odds ratio estimates that increased and decreased in statistical significance but that did not drop below 1.00, even when challenged with high levels of misclassification. Thus, even after simulating high levels of misclassification bias, a net protective effect of gun possession was not evident.

## Conclusions

On average, guns did not protect those who possessed them from being shot in an assault. Although successful defensive gun uses are possible and do occur each year,[33,57] the probability of success may be low for civilian gun

users in urban areas. Such users should rethink their possession of guns or, at least, understand that regular possession necessitates careful safety countermeasures. Suggestions to the contrary, especially for urban residents who may see gun possession as a surefire defense against a dangerous environment,[61,67] should be discussed and thoughtfully reconsidered. ∎

## About the Authors
*Charles C. Branas and Douglas J. Wiebe are with the Department of Biostatistics and Epidemiology, Firearm and Injury Center at Penn, University of Pennsylvania School of Medicine, Philadelphia. Therese S. Richmond is with the Division of Biobehavioral and Health Sciences, Firearm and Injury Center at Penn, and University of Pennsylvania School of Nursing, Philadelphia. Dennis P. Culhane is with the Cartographic Modeling Laboratory, University of Pennsylvania School of Social Policy and Practice, Philadelphia. Thomas R. Ten Have is with the Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Philadelphia.*
*Correspondence should be sent to Charles C. Branas, PhD, Department of Biostatistics and Epidemiology, University of Pennsylvania School of Medicine, Room 936 Blockley Hall, 423 Guardian Dr, Philadelphia, PA 19104-6021 (e-mail: cbranas@upenn.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints/Eprints" link.*
*This article was accepted February 7, 2009.*

## Contributors
C. C. Branas originated the study idea, oversaw the implementation of the study, and analyzed the data. T. S. Richmond and D. P. Culhane advised the study's implementation and analyses. T. R. Ten Have and D. J. Wiebe advised the study's implementation and analyzed the data. All authors wrote this article.

## Acknowledgments
This study was funded by the National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism (grant R01AA013119).
The authors are also indebted to numerous dedicated individuals at the Philadelphia Police, Public Health, Fire, and Revenue Departments as well as DataStat Inc, who collaborated in this work.

## Human Participant Protection
The study was approved by both the University of Pennsylvania and the Philadelphia Department of Public Health institutional review boards. A federal certificate of confidentiality was also provided by the National Institutes of Health.

## References
1. Branas CC. A review of: suing the gun industry: a battle at the crossroads of gun control and mass torts. *J Leg Med.* 2006;27(1):103–108.

2. Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System: 2000-2001. Available at: http://www.cdc.gov/ncipc/wisqars. Accessed March 1, 2009.

3. Wellford CF, Pepper JV, Petrie CV. *Firearms and Violence: A Critical Review.* Washington, DC: National Academies Press; 2005:6.

4. Vizzard W. *Shots in the Dark. The Policy, Politics, and Symbolism of Gun Control.* New York, NY: Rowman and Littlefield; 2000.

5. Wiebe DJ. Homicide and suicide risks associated with firearms in the home: a national case-control study. *Ann Emerg Med.* 2003;41:771–782.

6. Kellermann AL, Rivara FP, Rushforth NB, et al. Gun ownership as a risk factor for homicide in the home. *N Engl J Med.* 1993;329:1084–1091.

7. Grassel KM, Wintemute GJ, Wright MA, Romero MP. Association between handgun purchase and mortality from firearm injury. *Inj Prev.* 2003;9:48–52.

8. Cummings P, Koepsell T, Grossman D, Savarino J, Thompson R. The association between the purchase of a handgun and homicide or suicide. *Am J Public Health.* 1997;87:974–978.

9. Kleck G, Hogan M. National case-control study of homicide offending and gun ownership. *Soc Probl.* 1999;46(2):275–293.

10. Weiner J, Wiebe DJ, Richmond TS, et al. Reducing firearm violence: a research agenda. *Inj Prev.* 2007;13:80–84.

11. Poole C. Critical appraisal of the exposure-potential restriction rule. *Am J Epidemiol.* 1987;125:179–183.

12. Poole C. Exposure opportunity in case-control studies. *Am J Epidemiol.* 1986;123:352–358.

13. Poole C. Controls who experienced hypothetical causal intermediates should not be excluded from case-control studies. *Am J Epidemiol.* 1999;150:547–551.

14. Richmond TS, Branas CC, Cheney RA, Schwab CW. The case for enhanced data collection of gun type. *J Trauma.* 2004;57:1356–1360.

15. Branas C, Richmond T, Culhane D, Wiebe D. Novel linkage of individual and geographic data to study firearm violence. *Homicide Stud.* 2008;12(3):298–320.

16. Roberts I. Methodologic issues in injury case-control studies. *Inj Prev.* 1995;1:45–48.

17. Rothman KJ, Greenland S. Case-control studies. In: Rothman KJ, Greenland S, eds. *Modern Epidemiology.* 2nd ed. Philadelphia, PA: Lippincott Williams & Wilkins; 1998:93–114.

18. Waksberg J. Sampling methods for random digit dialing. *J Am Stat Assoc.* 1978;73:40–46.

19. Koepsell TD, McGuire V, Longstreth WT Jr, Nelson LM, van Belle G. Randomized trial of leaving messages on telephone answering machines for control recruitment in an epidemiologic study. *Am J Epidemiol.* 1996;144:704–706.

20. Harlow BL, Crea EC, East MA, Oleson B, Fraer CJ, Cramer DW. Telephone answering machines: the influence of leaving messages on telephone interviewing response rates. *Epidemiology.* 1993;4:380–383.

21. Herzog A, Rodgers W. The use of survey methods in research on older Americans. In: Woolson R, ed. *The Epidemiologic Study of the Elderly.* New York, NY: Oxford University Press; 1992.

22. Daves R. *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys.* 4th ed. Lenexa, KS: The American Association for Public Opinion Research; 2006.

**19**

23. Galea S, Tracy M. Participation rates in epidemiologic studies. *Ann Epidemiol.* 2007;17:643–653.

24. Keeter S, Kennedy C, Dimock M, Best J, Craighill P. Gauging the impact of growing nonresponse on estimates from a national RDD telephone survey. *Public Opin Q.* 2006;70:759–779.

25. Groves R. Nonresponse rates and nonresponse bias in household surveys. *Public Opin Q.* 2006;70:646–675.

26. Southeastern Pennsylvania Household Health Survey. Adult Respondent File, 2002, 2004, 2006. Philadelphia, PA: Public Health Management Corporation; 2006.

27. Ziegenhagen E, Brosnan D. Victim responses to robbery and crime control policy. *Criminology.* 1985; 23:675–695.

28. Felson R, Steadman H. Situational factors in disputes leading to criminal violence. *Criminology.* 1983; 21:59–74.

29. Wells W. The nature and circumstances of defensive gun use: a content analysis of interpersonal conflict situations involving criminal offenders. *Justice Q.* 2002;19:127–157.

30. Denton JF, Fabricius WV. Reality check: using newspapers, police reports, and court records to assess defensive gun use. *Inj Prev.* 2004;10:96–98.

31. Wolfgang M. A tribute to a view I have opposed. *J Crim Law Criminol.* 1995;86(1):188–192.

32. Kleck G, DeLone M. Victim resistance and offender weapon effects in robbery. *J Quant Criminol.* 1993;9(1): 55–81.

33. Kleck G, Gertz M. Armed resistance to crime: the prevalence and nature of self-defense with a gun. *J Crim Law Criminol.* 1995;86(1):150–187.

34. Koepsell TD, Weiss NS. *Epidemiologic Methods: Studying the Occurrence of Illness.* New York, NY: Oxford University Press; 2003:200.

35. van Buuren S, Boshuizen HC, Knook DL. Multiple imputation of missing blood pressure covariates in survival analysis. *Stat Med.* 1999;18:681–694.

36. Rubin D. *Multiple Imputation for Nonresponse in Surveys.* New York, NY: Wiley; 1987.

37. Xie D, Raghunathan TE, Lepkowski JM. Estimation of the proportion of overweight individuals in small areas - a robust extension of the Fay-Herriot model. *Stat Med.* 2007;26:2699–2715.

38. Branas CC, Elliott MR, Richmond TS, Culhane DP, Wiebe DJ. Alcohol consumption, alcohol outlets, and the risk of being assaulted with a gun. *Alcohol Clin Exp Res.* 2009;33:906–915.

39. Breslow NE. Statistics in epidemiology: the case-control study. *J Am Stat Assoc.* 1996;91(433):14–28.

40. Fox J. *Regression Diagnostics: An Introduction. Sage University Paper Series on Quantitative Applications in the Social Sciences.* Newbury Park, CA: Sage; 1991:7–79.

41. Nelson DE, Grant-Worley JA, Powell K, Mercy J, Holtzman D. Population estimates of household firearm storage practices and firearm carrying in Oregon. *JAMA.* 1996;275:1744–1749.

42. Kleck G, Gertz M. Carrying guns for protection: results from the National Self-Defense Survey. *J Res Crime Delinq.* 1998;35(2):193–224.

43. Kleck G. What are the risks and benefits of keeping a gun in the home? *JAMA.* 1998;280:473–475.

44. Decker S, Caldwell A. *Illegal Firearms: Access and Use by Arrestees.* Washington, DC: US Department of Justice, Office of Justice Programs, National Institute of Justice; 1997. Report ID NCJ 163496.

45. Dahlberg LL, Ikeda RM, Kresnow MJ. Guns in the home and risk of a violent death in the home: findings from a national study. *Am J Epidemiol.* 2004;160: 929–936.

46. Islam SS, Edla SR, Mujuru P, Doyle EJ, Ducatman AM. Risk factors for physical assault. State-managed workers' compensation experience. *Am J Prev Med.* 2003;25:31–37.

47. Warner BD, Wilson Coomer B. Neighborhood drug arrest rates: are they a meaningful indicator of drug activity? A research note. *J Res Crime Delinq.* 2003;40(2): 123–138.

48. Kleck G, McElrath K. The effects of weaponry on human violence. *Soc Forces.* 1991;69(3):669–692.

49. Mickey RM, Greenland S. The impact of confounder selection criteria on effect estimation. *Am J Epidemiol.* 1989;129:125–137.

50. Kleinbaum DG. Epidemiologic methods: the "art" in the state of the art. *J Clin Epidemiol.* 2002;55: 1196–1200.

51. White H. A heteroscedasticity-consistent covariance matrix estimator and a direct test for heteroscedasticity. *Econometrica.* 1980;48:817–838.

52. Getis A. Spatial statistics. In: Longley P, Goodchild M, Maguire D, Rhind D, eds. *Geographical Information Systems Volume 1 Principles and Technical Issues.* 2nd ed. Chichester, England: John Wiley and Sons; 2000:239–251.

53. Gruenewald PJ, Remer L. Changes in outlet densities affect violence rates. *Alcohol Clin Exp Res.* 2006; 30:1184–1193.

54. Smith T. A seeded sample of concealed-carry permit holders. *J Quant Criminol.* 2003;19:441–445.

55. Rafferty AP, Thrush JC, Smith PK, McGee HB. Validity of a household gun question in a telephone survey. *Public Health Rep.* 1995;110:282–288.

56. Kellermann AL, Rivara FP, Banton J, et al. Validating survey responses to questions about gun ownership among owners of registered handguns. *Am J Epidemiol.* 1990;131:1080–1084.

57. Hemenway D. The myth of millions of annual self-defense gun uses: a case study of survey overestimates of rare events. *Chance.* 1997;10(3):6–10.

58. Thompson DC, Thompson RS, Rivara FP, Adams J, Hillman M. Risk compensation theory should be subject to systematic reviews of the scientific evidence. *Inj Prev.* 2001;7(2):86–88.

59. Peltzman S. The effects of automobile safety regulation. *J Polit Econ.* 1975;83:677–725.

60. Wilkinson DL, Fagan J. Role of firearms in violence scripts: the dynamics of gun events among adolescent males. *Law Contemp Probl.* 1996;59(1):55–89.

61. Wilkinson DL. *Guns, Violence, and Identity Among African American and Latino Youth.* New York, NY: LFB Scholarly Publishing LLC; 2003.

62. Ikeda RM, Dahlberg LL, Kresnow MJ, Sacks JJ, Mercy JA. Studying "exposure" to firearms: household ownership v access. *Inj Prev.* 2003;9(1):53–57.

63. Cummings P, Koepsell TD. Does owning a firearm increase or decrease the risk of death? *JAMA.* 1998; 280:471–473.

64. Branas CC, Nance ML, Elliott MR, Richmond TS, Schwab CW. Urban-rural shifts in intentional firearm death: different causes, same results. *Am J Public Health.* 2004;94:1750–1755.

65. Brookhart MA, Wang PS, Solomon DH, Schneeweiss S. Evaluating short-term drug effects using physician-specific prescribing preference as an instrumental variable. *Epidemiology.* 2006;17:268–275.

66. Staiger D, Stock J. Instrumental variables regression with weak instruments. *Econometrica.* 1997;65: 557–586.

67. Anderson E. *Code of the Street: Decency, Violence, and the Moral Life of the Inner City.* New York, NY: W. W. Norton; 1999.

20